UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------------------X   Civil Action No.
LARRY WILLIAMS,                                                              :   21-cv-3005
                                                                            :   (ENV)(RML)
                                        Plaintiff,                          :
        -against-                                                           :   **FIRST AMENDED**
                                                                            :   **VERIFIED**
THE CITY OF NEW YORK; NEW YORK CITY TRANSIT                                  :   **COMPLAINT**
AUTHORITY; DETECTIVES OR FORMER DETECTIVES                                   :   **AND JURY DEMAND**
MICHAEL NORRITO (Shield No. 3736), JOSEPH                                    :
TUMBARELLO (Shield No. 883) and ROBERTO CARTER,                              :
in their individual and official capacities; FORMER ASSISTANT               :
DISTRICT ATTORNEYS, ROBERT SULLIVAN, in his                                 :
individual and official capacities; DOUGLAS KALLEN, in his                  :
individual and official capacities; GERALD GREENE, in his                   :
individual and official capacities; PHYLLIS MINTZ, in her                   :
individual and official capacities; ERIC GONZALEZ, DISTRICT                 :
ATTORNEY, KINGS COUNTY, in his individual and official                      :
capacities; and JOHN DOES 1, 2, 3, etc., and JANE DOES 1, 2, 3,            :
etc. (whose identities are unknown but who are or formerly were             :
Police Officers and/or supervisory personnel of the New York City          :
Police Department and/or Transit Authority Police Department),              :
all being sued in their individual and official capacities,                 :
                                                                            :
                                        Defendants.                         :
--------------------------------------------------------------------------------X

        Plaintiff Larry Williams, by his attorney John F. Schutty, Esq., alleges as follows for his

Complaint:

## **PRELIMINARY STATEMENT**

        1.      This is a civil action to redress the deprivation, under color of state law, of plaintiff's

rights, privileges, and immunities under the United States and New York State Constitutions,

including, without limitation, deprivation of his state and federal rights to a fair trial, due process of

law, equal protection, and freedom from unreasonable and unlawful seizures.

        2.      This civil rights action is grounded upon defendants' wrongful and improper acts,

primarily including, without limitation: fraudulent concealment, suppression of exculpatory

evidence and related cover-up, false arrest, false imprisonment, malicious prosecution and related

deceit and dishonesty; conspiracy to cover-up law enforcement misconduct and the innocence of

plaintiff; racially motivated misconduct and related conspiracy; negligent and intentional infliction of emotional distress; negligent hiring, training, instruction, discipline and retention of police officers, detectives, other New York City employees and agents, and Kings County assistant district attorneys in disregard of their constitutional and statutory obligations and responsibilities in conducting criminal investigations, making arrests, and pursuing prosecutions; and deliberate indifference to the need to establish and implement policies and procedures to protect persons from being wrongfully and unconstitutionally accused of and prosecuted for crimes.

## JURISDICTION & VENUE

3.      This action is brought pursuant to 42 U.S.C. §§ 1983, 1985(3), 1986, 1988, the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, Article 1, §§ 1, 6, 11 and 12 of the Constitution of the State of New York, and the statutory and common law of the State of New York.   Jurisdiction is founded upon 28 U.S.C. § 1331 and § 1343 and the aforementioned statutory and constitutional provisions. Plaintiff further invokes the supplemental jurisdiction of the Court to hear and decide claims arising under state law.

4.      The acts and transactions constituting the civil rights violations occurred in the County of the Kings, in the Eastern District of New York.  In addition, the defendants reside, are found, have agents, or transact their affairs in the Eastern District of New York.  Venue is therefore, proper in this district pursuant to 28 U.S.C. §§ 1391 (b).

## PARTIES AND RELATED PERSONS

5.      Plaintiff Larry Williams is a black male citizen of the United States of America.  At all relevant times, he was domiciled in the County of Kings, City and State of New York.

6.      Defendant City of New York (City) is and was, at all times relevant, a municipal corporation organized according to the laws of the State of New York.

7.      The New York City Police Department (NYPD) is an agency of defendant City charged with "the mission to enhance the quality of life in [New York City] by working in accordance with constitutional rights to enforce the laws...."  *Briefing Paper of the Governmental Affairs Division, New York City Council, Committee on Civil Rights and Committee on Public Safety, January 24, 2007.*

8.      Defendant New York City Transit Authority (Transit Authority) is and was, at all times relevant, a public benefit corporation organized according to the laws of the State of New York.

9.      Prior to March 31, 1995, the Transit Authority maintained its own police force, known as the New York City Transit Authority Police Department (TAPD).

10.      Defendant Detective Michael Norrito (Shield No. 3736) was, at all relevant times, a City police officer assigned to the NYPD.  He is being sued in his individual and official capacities. Upon information and belief, he is no longer a City police officer due to a felony ("Racketeering") conviction.

11.      Defendant Detective Joseph Tumbarello (Shield No. 883) was, at all relevant times, a police officer assigned to the TAPD who became a City police officer after the 1995 merger of the two police departments (the NYPD and the TAPD).  He is being sued in his individual and official capacities.  Upon information and belief, he is no longer a City police officer.

12.      Defendant Detective Roberto Carter (Shield No. unknown) was, at all relevant times, a City police officer assigned to the NYPD.  He is being sued in his individual and official capacities.  Upon information and belief, he is no longer a City police officer.

13.      Defendant Eric Gonzalez is, and he and his predecessors in his office were, at all times relevant to the circumstances underlying this Complaint, employed by the City as the Kings

County District Attorney.  He is being sued in his individual and official capacities, and as the successor to such previous District Attorneys.

14.     Defendant Robert Sullivan was, at all times relevant to the circumstances underlying the Complaint, employed by the City as an assistant district attorney (ADA) in Kings County.  Upon information and belief, he is no longer an ADA.  He is being sued in his individual and official capacities.

15.     Defendant Douglas Kallen was, at all times relevant to the circumstances underlying the Complaint, employed by the City as an assistant district attorney (ADA) in Kings County.  Upon information and belief, he is no longer an ADA.  He is being sued in his individual and official capacities.

16.     Defendant Gerald Greene was, at all times relevant to the circumstances underlying the Complaint, employed by the City as an assistant district attorney (ADA) in Kings County.  Upon information and belief, he is no longer an ADA.  He is being sued in his individual and official capacities.

17.     Defendant Phyllis Mintz was, at all times relevant to the circumstances underlying the Complaint, employed by the City as an assistant district attorney (ADA) in Kings County.  She is being sued in her individual and official capacities.

18.     The term related persons refers to individuals who participated in the wrongful conduct against plaintiff alleged in this Complaint but who are not named as defendants because of immunity doctrines. Related persons include Kathy Plazner, who was, at all times relevant to the circumstances underlying the Complaint, employed by the City as an assistant district attorney (ADA) in Kings County.  Ms. Plazner, who, upon information and belief, is deceased, was the grand jury prosecutor in plaintiff's criminal action.

19.     Defendants John Does 1, 2, 3, etc., and Jane Does 1, 2, 3, etc., were, at all relevant times, police officers and/or supervisory personnel of the NYPD and/or TAPD.  Their identities are as yet unknown to plaintiff, although they may include, depending upon facts developed during discovery proceedings, officers who were involved in the investigation of the crime for which plaintiff was convicted: Detective L. Rango (Shield No.: unknown), Detective V. K. Herlihy (Shield No.: unknown), Detective Eugene Collins (Shield No.: unknown), Detective Wecker (Shield No. 297), Detectives or Sergeants Hernandez, Stewart, Higgins and Shea (Shield Nos.: unknown), Lieutenant Gardella (Shield No.: unknown) and Lieutenant Arnenson (Shield No. 148).  They may be added as defendants in their individual and official capacities.  Whether they are currently employed by the City as police officers or supervisory personnel is unknown to plaintiff.

20.     At all times relevant to the circumstances underlying this Complaint, upon information and belief, all police officer defendants were assigned to the 67th Precinct, located in the County of Kings, City and State of New York, including former TAPD Detective Tumbarello who was assigned to the investigation in this case in conjunction with 67th Precinct police officers.

21.     At all times relevant to the circumstances underlying this Complaint, and in all their actions described herein, all the individual defendants were acting under color of state law as agents, servants and employees of the defendants City and/or Transit Authority and under their direction and control.

22.     Pursuant to the March 31, 1995 Memorandum Of Understanding Among The Metropolitan Transportation Authority, The New York City Transit Authority and The City of New York On Merger of The New York City Transit Authority Police Department and The New York City Police Department, the City agreed to save harmless, indemnify and defend the Transit Authority and its employees for damages and compensation arising from various prior and future events and related claims.  The City's agreed liability included, without limitation, any act taken or

-5-

omitted to have been taken by a sworn member of the TAPD in the performance of his or her duties as a police officer or for which NYCTA may otherwise be held liable, in any such case with respect for an occurrence which took place prior to the merger date. Therefore, the City is responsible to save harmless, indemnify and defend the Transit Authority and its police personnel with respect to the claims for damages and compensation being sought by plaintiff in this litigation due to the involvement of defendant Detective Tumbarello and/or any other pre-merger Transit Authority police personnel in the circumstances underlying this Complaint; and is liable for the pre- and post-merger actions taken or omitted to have been taken by defendant Detective Tumbarello and/or other Transit Authority police personnel who were involved.

## **ADMINISTRATIVE PROCEEDINGS**

23.     On December 29, 2020, within ninety (90) days after the claims herein sued upon arose (although the fraudulent concealment of evidence continues up and through today), plaintiff caused his sworn notice of claim, in proper form, to be duly served upon defendant City.

24.     Although more than thirty (30) days have elapsed since service of such notice of claim, the Comptroller and defendant City have neglected and/or refused to adjust or pay said claims even though plaintiff's notice of claim was acknowledged on January 7, 2020 and assigned "Claim Number: 2021PI000463."

25.     This action has been commenced within one year and ninety days after the causes of action set forth herein accrued (in fact, the fraudulent concealment of evidence continues till this day, and thereby continues to accrue, through today), and within the statute of limitations applicable to federal civil rights actions brought pursuant to 42 U.S.C. § 1983 and §1985(3), when fraudulent concealment is the alleged misconduct.

## HISTORY AND PRELIMINARY STATEMENT

26.     The following factual allegations, except for plaintiff's allegations about himself and his conduct, are made upon information and belief based on official police, prosecution and court documents, records and transcripts of testimony, and on post-conviction investigations by plaintiff and his present counsel.

27.     The unlawful charges brought against plaintiff and his unjust prosecution and conviction arose out of the June 14, 1983 murder and robbery of John Choi.

**The Murder & Robbery of John Choi**

28.     On the afternoon of June 14, 1983, John Choi and Jae Hark Kim had come from Manhattan to the vicinity of the intersections of Nostrand and Church Avenues in Brooklyn, New York to look at a store for business reasons.

29.     Shortly after approximately 4:00 p.m., Kim and Choi entered the subway station at Nostrand and Church Avenues to return to Manhattan.

30.     They entered through a stairwell on Nostrand Avenue at the northwest corner of Nostrand and Church Avenues.

31.     On the other side of Nostrand Avenue there was another set of subway stairs to the platform for Manhattan bound trains, with an entrance on Church Avenue at the northeast corner of Nostrand and Church Avenues.

32.     As Kim and Choi were walking downstairs into the subway station, five young black men chased Choi down those stairs, across a subway platform, and up onto the first of two sets of stairs leading up to Church Avenue.

33.     Choi fell on that first set of stairs, where two or three of those young men attacked him while another of those young men physically confronted Kim, to block him from coming to Choi's aid.

34.     After Choi fell on the stairs, his assailants turned him over and took money from his pockets; and one of them stabbed him in the chest with a knife.

35.     All the crime perpetrators then fled from the station.

36.     Kim then carried Choi up to the street and took him to a nearby store at 1450 Nostrand Avenue, where they waited until police arrived.

37.     At the time of those events, Abdul Rahman was a vendor working within that subway station at that Nostrand and Church Avenue station, near the area where the crime was committed. Rahman had a stock of pantyhose to sell to people as they entered and exited the subway.

38.     Rahman witnessed the events described above and the interactions between and among Kim, Choi and their assailants, including seeing several of those assailants pass in front of him as they chased Choi on to the stairs where he fell and seeing one of the assailants wearing a distinctive brown shirt stab Choi, and then seeing several of them flee as they ran back across the station to flee by way of the stairs at the northwest corner of Nostrand and Church Avenues.

39.     After those events Rahman saw a knife on the stairs where Choi had been stabbed and picked it up, using a cellophane wrapper from a pair of the pantyhose that he had for sale.

40.     The first two police officers to respond to the subway crime scene were 67th Precinct Officers John Castricone (Shield No. 7615) and Margaret Pilato (Shield No. 26061). Upon information and belief, Officer Pilato is deceased.

41.     Officer Castricone entered the station where he saw and spoke to Rahman, who handed the cellophane wrapper with the knife to him.

42.     Officer Castricone left the station and, along with Officer Pilato, found Kim and Choi at the store to which Kim had carried Choi. They assisted in arranging for Choi to be taken by ambulance to Kings County Hospital.

43. At approximately 7:00 p.m. on June 15, 1983, Choi was pronounced dead by Associate Medical Examiner Manuel Navarro.

44. Dr. Navarro performed an autopsy and determined that Choi died of a stab wound to his chest.

45. At least one other 67th Precinct police officer, Patrolman Williams (Shield No. 3496), a male whose first name is unknown, came to the crime scene, reportedly arriving after or around the time Choi was taken away by ambulance.

46. At the Nostrand Avenue store to which Kim had carried Choi and later at the 67th Precinct, Kim gave police officers vague descriptions of the men who had attacked them, including the man who stabbed Choi.

47. According to Officer Castricone's official report, known as a DD5, Kim described the person who did the stabbing as a male black, 16 to 18 years in age, medium weight, unknown eye and hair color, short hair, no facial hair, *and 6 feet tall* (emphasis added).

48. According to Officer Castricone's report, Kim described a second male black (the one who confronted him, allegedly plaintiff herein) as 16 to 18 years of age, thin, no facial hair, with unknown eye and hair color, unknown hair length, and 5 feet 8 inches tall.

49. Castricone's report states that Kim was unable to identify the additional two perpetrators except that they were male blacks and 13 to 14 years old.

50. According to the official DD5 report of an interview at the 67th Precinct, a report made, upon information and belief, by Detective Norrito, Kim described the man who did the stabbing as a male black, *5 feet 9 inches tall* (emphasis added), 18 to 20 years of age, medium build, short hair, chocolate color shirt and dark pants.

51. According to the official complaint report, known as a UF61, made by Officer Williams, Kim described the stabber as a male black, 18 to 20 years old, *5 foot 8 to 5 foot 9 inches*

*tall* (emphasis added), weighing 130 lbs., medium build, chocolate color shirt, dark pants, dark sneakers and short hair.

52.     This Officer's report stated that Kim described the second perpetrator (allegedly plaintiff herein) as a male black, 18 to 20 years of age, wearing sneakers, with no further details as to height, weight, or otherwise; and, as to the other male blacks who were on the subway station, stated that there were three to four of them, 18 to 20 years of age, wearing sneakers.

53.     All three reports – by Castricone, Norrito and Williams – were dated June 14, 1983.

54.     According to a Detective Division Unusual Occurrence Report dated June 14, 1983, naming Detective Norrito as the assigned 67th Precinct detective along with Detective Tumbarello, witness Kim described the perpetrators as three male blacks, 18 to 20 years of age, *5 foot 8 inches to 5 foot 10 inches tall* (emphasis added), thin, brown shirt, shorts, sneakers.

55.     According to another Detective Division Unusual Occurrence Report dated June 14, 1983, naming Detective Norrito as the assigned detective, the stabber was described as a male black, age 18, *5 feet 9 inches tall* (emphasis added), weight 160 pounds, wearing "Dark Brown [Shirt] 2 - long pants - knife" [*misspelled "Short" in police report*].

56.     The same report described a second assailant as a male black, age 18, weighing 140 pounds, 5 feet 8 inches tall and "wearing Red & White short sleeve shirt."

57.     Given the paucity of descriptive information provided by Kim regarding the person who stabbed Choi, Kim's information about that man's height was a key issue of fact from the beginning of the police and prosecution investigation and became the crucial evidentiary factor in the charges against, and the prosecution of, the criminal defendants.

58.     An internal 67th Precinct "Homicide Worksheet" provided the NYPD with an assessment of the reliability of the various eyewitness descriptions of the assailants. This 67th Precinct Homicide Worksheet shows that "Can ID" assailant designations checked off next to

-10-

eyewitnesses Eric Head and Abdul Rahman, and "Possibly Can ID" next to Kim's name. Although plaintiff has just been made aware of this document, he claims that it was not made available to him prior to his criminal trial to assist with the impeachment of eyewitness Jae Kim.

59.     On June 14, 1983, Choi was 5 feet 6 inches tall, and Kim was 5 feet 4 inches tall.

60.     On June 14, 1983, Cy Greene, the alleged and criminally-charged stabber, was shorter than both Choi and Kim, as Cy Greene was about 5 feet 1 inch tall.

61.     Since Cy Greene was a short person, any identification of him as a 6 foot or approximately 5 foot 9 inches tall person would not have been credible unless the defendants herein fabricated and secreted evidence.

62.     The detectives assigned to lead the investigation into the robbery and murder of Choi were defendants Norrito and Tumbarello.

63.     Defendant Robert Sullivan was the ADA initially assigned to the case and participated in the investigation.

64.     ADA Sullivan visited the 67th Precinct on the evening of June 14, 1983, where various police officers, including Detectives Norrito and Tumbarello, had brought him witnesses to be interviewed. ADA Sullivan played a purely investigative role that evening.

65.     ADA Sullivan questioned and obtained information about the investigation from the police defendants, including, but not limited to, defendants Norrito and Tumbarello; and interviewed and/or participated in the interviews of various significant witnesses, and upon information and belief, all of the witness interviews conducted by ADA Sullivan were tape recorded.

66.     Jae Kim spoke English, although his native language was Korean.

67.     Kim had been in the United States for about four years at the time he was interviewed on June 14, 1983.

68.     Kim was interviewed and answered questions in English.

**Suppression of Kim's "Tall Guy" Description of the Stabber**

69.     At the 67th Precinct, Kim was interviewed by Detectives Norrito and Tumbarello and later by ADA Sullivan.

70.     In an audio recorded interview conducted by ADA Sullivan in the presence of Detectives Tumbarello and Norrito, Kim gave a narrative of the events during which he described the brown-shirted stabber, the man with the knife, as a "tall guy."

71.     In that audio recorded interview, Kim did not give a height description other than stating the stabber was a "tall guy," but did give a distance description of his distance from the stabber in feet ("two feet"), rather than meters.

72.     One of the principal ways that the defendants and the related persons wrongfully and maliciously deprived plaintiff of his rights before, at and after the 1985 trial came about when they provided defense trial counsel with a falsely and deceitfully contrived transcript of the audio recorded precinct interview of Kim.  The transcript was fabricated by ADA Kallen to conceal the "tall guy" statements of this witness.

73.     In that regard, before the 1985 trial, defendants and the related persons provided plaintiff's then defense counsel with a typewritten transcript of the Kim precinct interview (and no audiotape) containing various handwritten corrections, but omitted from that presumably corrected transcript was the key height description of the stabber that Kim had given: that the man with the knife was a "tall guy."  ADAs Kallen and Greene are responsible for this wrongdoing.

74.     This deceit was compounded throughout the case by the defendants and the related persons' failure to disclose Kim's precinct-interview description of the stabber as a "tall guy."

75.     By this deceit, the defendants and related persons misled the defense and the jury and were able to maintain the false contention at trial that the descriptions of the stabber as 6 feet or 5 feet 9 inches tall that had been given by Kim could be disregarded because, as a Korean, Kim only

measured in meters and centimeters; and that Kim's identification of Cy Greene should be credited even though at 5 feet 1 inch Cy Greene was a "short," not "tall," person.

76.     That deceitful contention and the related credibility of Kim's identification of Cy Greene at trial would have been seriously undermined had the "tall guy" description not been omitted from the transcript of Kim precinct statement and had it not been kept undisclosed throughout the prosecution until discovered by Cy Greene's new defense counsel in 2004.

77.     When the defendants (Sullivan, Norrito, Tumbarello, Kallen & Greene) and related persons failed to include in the transcript of the Kim precinct statement the descriptive information about the killer with the knife – "that he was a tall guy" – and failed to disclose that descriptive information throughout the prosecution, highly material exculpatory evidence was suppressed and withheld that, at the very least, would probably have favorably changed the jury verdict.

78.     That exculpatory evidence undermined the prosecution case against plaintiff, Cy Greene's alleged accomplice and then best friend (plaintiff), and strongly supported plaintiff's defense that this was a case of mistaken identity and wrongful identification and that both criminal defendants were actually innocent.

79.     The defendants and related persons' wrongful conduct thereby deprived plaintiff of his state and federal rights to a fair trial, due process of law, equal protection, and freedom from unreasonable and unlawful seizures, but this was just the smallest piece of the defendants' misconduct and doesn't even form the true basis of what plaintiff is claiming herein.

80.     This bit of significant misconduct was, as it turned out, one small part of a series of blatantly wrongful acts and omissions which pervaded and perverted the process of justice in regard to the charges against plaintiff and his resulting prosecution, wrongful conviction and wrongful incarceration. The even more significant and additional wrongful acts and omissions are described

below – a continuing fraudulent concealment of exculpatory evidence by police and prosecutors up and through today.

81.     Singularly and cumulatively, along with the suppression of the "tall guy" description, the wrongful acts described below establish both the lack of probable cause from the inception of the charges brought against plaintiff and Cy Greene and throughout the process of their prosecution, as well as the defendants' liability herein for the injuries to plaintiff caused by their violations of his civil rights.

**Other Witness Information Negating Probable Cause to Arrest Plaintiff**

82.     At approximately 4:35 p.m. on June 14, 1983, at the scene of the crime and later at the 67th Precinct, Abdul Rahman, the vendor who had witnessed the events of the crime at the subway station, was variously interviewed by police officers, including defendants Norrito and Tumbarello.

83.     According to an official police report, believed to have been authored by Detective Norrito, when Rahman was interviewed on June 14, 1983 at the 67th Precinct, he described three of the perpetrators that he had seen as 5 feet 8 inch male blacks, weighing 120 pounds: one being 15 to 19 years old and wearing a red shirt and tan shorts, a second being 15 to 20 years old and wearing a brown shirt and dark pants, and the third being 17 years old and wearing a white shirt with stripes.

84.     According to various police reports, several neighborhood witnesses - James Robinson, Lavaughn Ryan, Fred Thomas and Eric Head gave accounts of seeing men running from the subway station immediately after the incident, with heights varying from 5 feet 5 inches to 6 feet.

85.     Another witness, Reynold Guerrier, a cab driver, described three men, seen by other witnesses running from the subway station, who entered his taxicab several blocks away from the scene of the crime.

-14-

86.     Police reports concerning all of these witnesses included the information described in the following paragraphs.

87.     On the evening and night of June 14, 1983, Eric Head was interviewed by defendants, including Detectives Norrito and Tumbarello, at the 67th Precincts.

88.     Head had been at work that day at a store located at 2846 Church Avenue, on the other side of the street from the subway station entrances and exits on the north side of Church Avenue.

89.     Head told the detectives that at approximately 4:35 p.m. that day he saw two men leave the subway station and flee west on Church Avenue.

90.     Just a few seconds later, Head saw a third person leave the subway station and flee in the same direction on Church Avenue.

91.     Head recognized all three of these persons from the area "he knew them to hang out and pick pockets at Nostrand and Church."

92.     During his police interview Head was shown photographs.

93.     According to the June 14, 1983 handwritten entries in Detective Tumbarello notebook, maintained for this case only, Head identified the photographs of the three people he had seen at the subway crime scene: Joseph Ross, Ronald Blanding and Lenny Best (the older brother of NYPD informant and subsequent self-confessed assailant of John Choi, Mark Best).

94.     Lenny Best was the older brother of Mark Best, who, under circumstances referred to below, was coerced into falsely identifying Cy Greene as the person who had stabbed Choi in the subway robbery.

95.     Both Best brothers were known by the police, including, without limitation, Detectives Norrito and Tumbarello, and by persons in the neighborhood of the Nostrand Avenue and Church Avenue station, including two persons interviewed by the police after the June 1983 Choi

-15-

stabbing and robbery, to have previously been involved in criminal conduct, including robbery, picking pockets and weapons possession.

96.     On June 15, 1983, based, at least in part, on Eric Head's June 14, 1983 precinct interview identification, Lenny Best was taken into custody by Detectives Norrito and/or Tumbarello to be questioned about the robbery and murder of Choi.

97.     While the police officer defendants were taking Lenny Best to the 67th Precinct on June 15, 1983, Lenny Best escaped from a police car and was not subsequently apprehended or questioned by the defendants regarding the robbery and murder of Choi.

98.     Lenny Best was a prime suspect for the robbery and murder of Choi and when he escaped it was a source of serious concern to the police defendants and a basis for official discipline for misconduct, which risk and attempted avoidance of risk seriously affected the police investigation and undermined its integrity and credibility.

99.     The defendants, particularly including Detectives Norrito and Tumbarello, and the related persons, considered Mark Best, as well as Lenny Best, to be prime suspects for the robbery and murder of Choi.  This was never reported to plaintiff or Cy Greene.

100.    It was an official requirement, as well as the custom and practice of the NYPD, to create Unusual Occurrence reports for case related events, including irregular events.

101.    Such a report was required when a suspect escaped from police custody.

102.    No such report was created to record Lenny Best's escape.

103.    In their attempt to overcome the problem of having allowed Lenny Best to escape and to avoid the consequences of not making the required Unusual Occurrence report, and in trying to wrongfully close their investigation with an arrest of an alleged perpetrator without regard to proper investigatory or probable cause standards, and to conceal the involvement of two NYPD informants in the murder, the defendants, particularly Detective Norrito and Tumbarello, and related

persons, wrongfully acted in a number of ways, in addition to those described above, that eventually led to the false charges made against plaintiff.

104.    On June 14, 1983, at approximately 5:30 p.m., James Robinson was interviewed at the 67th Precinct.

105.    Robinson reportedly told the police that he was in the area of Nostrand and Church Avenues at the approximate time of the incident when a man told him to stop another man who was running on Nostrand Avenue.

106.    Robinson chased the man "whom he described as a black male, *approximately six feet in height*, with a medium build, a small afro, and *wearing a brown shirt* and pants[,] west on Church Avenue, then left on Lloyd Street, then right on Erasmus Street, and then right on Veronica Place" (emphasis added).

107.    At Veronica Place and Erasmus Street, Robinson saw the man run to and enter a taxicab that was stopped at an open fire hydrant.

108.    Robinson saw that two other men were already sitting in the cab when that man entered it.

109.    On June 14, 1983, at approximately 7:45 p.m., Lavaughn Ryan was interviewed on Church Avenue by a police officer from the 67th Precinct.

110.    Ryan told the officer that at the approximate time of the incident he had seen three men running on Church Avenue and that they had turned from Church Avenue onto Lloyd Street.

111.    Ryan described one of the men as being approximately 5 five feet 9 nine inches in height.

112.    On June 15, 1983, at approximately 1:00 p.m., Fred Thomas was interviewed by a police officer from the 67th Precinct.

113.     Thomas told the police officer that he was in the area of Nostrand and Church the day before at approximately 4:20 p.m. selling pantyhose.

114.     Thomas stated that at that time, date and location, he heard Abdul Rahman, a person known to him, yelling from the subway station.

115.     Thomas immediately went towards the station where he saw three male black men, 18-20 years old, running from the subway station, west on Church Avenue.

116.     Thomas gave descriptive information about the three men, including their being 5 feet 5 inches, 5 feet 6 inches and 5 feet 7 inches in height.

117.     On June 14, 1983, at approximately 6:35 p.m., Reynold Guerrier was interviewed by defendants ADA Sullivan and Detectives Norrito and Tumbarello at the 67th Precinct – this interview was never disclosed to the criminal defendants and was perhaps the most significant, secreted evidence (and biggest fraudulent secretion) of all.  It is discussed in much greater detail below.

118.     Prior to his interview at the Precinct, Guerrier had been interviewed on June 14, 1983 at his home by Detective V. K. Herlihy, and the official DD5 report about the Guerrier information was signed with Detective Herlihy's name.  This DD5 report indicated that Guerrier had little significant information and its production to the criminal defendants would subsequently serve to downplay the significance of any additional information that Guerrier might possess.

119.     Upon information and belief, defendant ADA Sullivan was aware, on June 14, 1983 or soon thereafter, of the information provided by Guerrier in the Herlihy interview.

120.     During his interview by Detective Herlihy, Guerrier told him that he was the driver of a taxicab, license plate number 61L619, that had been entered by three men earlier that day at approximately 4:45 p.m.

121.    Guerrier was off-duty, stopped near Veronica Place at an open fire hydrant, when three men got into the back of his taxi.

122.    Guerrier informed them that he was not working.

123.    The men pushed four dollars through the plexi-glass divider and told Guerrier that they wanted to go to Flatbush Avenue.

124.    They also told Guerrier "We got a problem."

125.    Guerrier drove them to Flatbush Avenue and Clarendon Road where they exited, walking towards Courtelyou Road.

126.    Guerrier described the three men as black males, approximately 18-19-20 years in age, two of thin build, all wearing sneakers.

127.    Guerrier described one of the two thin built men as wearing a brown shirt and shorts; and another of the three men, 130 pounds in weight, as wearing a red shirt, shorts, and a blue or black cap.

128.    All of this information was essentially contained in the official DD5 police report of the Guerrier home interview by Detective Herlihy, which also added that when the men entered the cab they were out of breath.

129.    Very significant information provided by Guerrier to law enforcement was, however, left out of the Herlihy DD5, and was never conveyed to plaintiff, Cy Greene or their counsel.

130.    That exculpatory information, detailed within the audiotape and transcript of the Guerrier interview conducted by ADA Sullivan in the presence of Detectives Norrito and Tumbarello, was intentionally not provided to defense counsel and has been unlawfully and intentionally secreted up to and through today by ADAs Kallen, Greene, Mintz and Gonzalez.  That fraudulent concealment continues up and through this date.

131.    Some of that exculpatory information was discovered circumstantially by subsequent defense counsel for Cy Greene, when Cy Greene obtained a copy of Detective Tumbarello's notebook during Cy Greene's civil rights action.

**Police Coercion Leading to a False Identification By Mark Best**

132.    On June 15, 1983, purportedly based on an identification by eyewitness Eric Head, Joseph Ross was brought to the 67th Precinct at approximately 5:00 p.m. to be interviewed by the defendants, including Detectives Norrito and Tumbarello.

133.    Ross purportedly told the police, according to an NYPD DD5 official report, that he was in the area of Nostrand and Church Avenues at approximately 4:00 p.m. on June 14th with his friend, Mark Best.

134.    According to the DD5, Ross also purportedly told the police that at approximately 4:10 p.m. he left Mark Best at Nostrand and Church; that he knew nothing about the incident, and that the police should question Mark Best.

135.    On June 16, 1983, at approximately 11:20 a.m., Mark Best was interviewed at the 67th Precinct by ADA Sullivan and Detectives Norrito and Tumbarello.

136.    Upon information and belief, Mark Best was one of John Choi's assailants and an NYPD informant; he was also a person psychologically and physically vulnerable to police pressure and was in fear that he and/or his brother would be charged with the murder of Choi and that this would increase the penalties for other pending criminal charges filed against him.

137.    Upon information and belief, Mark Best was subjected to improper police pressure and coercion and induced by promises and provision of benefits into giving false statements about the June 14th incident.

138.    According to the official DD5 prepared in connection with his interview, Mark Best told defendants Sullivan, Norrito and Tumbarello that at approximately 4:20 p.m. on June 14th he was at the Nostrand and Church Avenue subway station standing on the top of the staircase.

139.    In his alleged account of the attack, robbery, and murder of Choi by three persons, as recorded in the DD5, Mark Best said that he saw "Tony Rome" a/k/a Cy Greene, who he knew, take out a knife and stab Choi in the back and then flee from the station with the two other men.

140.    The DD5 states that Mark Best looked at photographs of Cy Greene and gave the police Cy Greene's address.

141.    The police and prosecution defendants wrongfully used a coerced and non-credible statement of Mark Best, and an offer of an undisclosed deal/immunity for his cooperation, to accomplish their goal of closing the case expeditiously for improper, illegal and unconstitutional reasons.

**The Circumstances Surrounding the Arrests of Plaintiff & Cy Greene**

142.    On June 21, 1983, at approximately 5:00 p.m., Detective Norrito and others arrived at Cy Greene's home at 1431 Nostrand Avenue and Cy Greene and plaintiff were arrested by Detective Norrito.

143.    Plaintiff Larry Williams, who just happened to be visiting Cy Greene at that time, was also arrested, simply because he was with Cy Greene at the time of the latter's arrest.

144.    Both men were taken to the 67th Precinct and interviewed there.

145.    During their separate interviews, both plaintiff and Cy Greene told the police and prosecutor that they did not participate in the robbery or murder of Choi and that they each had independent alibis supported by third-parties.

146.    The police and prosecution brought both Jae Kim and Mark Best to the 67th Precinct on June 21, 1983, purportedly to view plaintiff and Cy Greene in separate line-ups.

147.    While plaintiff and Cy Greene were at the 67th Precinct awaiting the line-ups, they were held in a holding cell.

148.    Significantly, while sitting together in a jail cell at the 67th Precinct that day, plaintiff and Cy Greene observed an Asian man repeatedly approaching their jail cell to stare at them.  When they inquired of a janitor who the Asian man was and why he was staring at them, they were told that the man was there to identify the men who murdered his friend.

149.    Later that afternoon, plaintiff and Cy Greene were placed in lineups and they were allegedly identified by Mark Best and Jae Kim, as two of the individuals who assaulted, robbed and murdered John Choi.  Cy Greene was allegedly identified as the man who stabbed John Choi.

150.    Upon information and belief, the police and prosecution allowed Jae Kim to view plaintiff and Cy Greene in their jail cell so that Kim would know who to pick out of the line-ups, which were to be conducted later that evening.

151.    On June 21, 1983, plaintiff was placed in a line-up purportedly for potential identification as one of Choi's assailants.

152.    This line-up was conducted by Detectives Norrito and Tumbarello and ADA Sullivan.

153.    Under the circumstances described in this Complaint, the lineup identification of plaintiff by eyewitness Jae Hark Kim and by Mark Best were wrongfully obtained, were not credible, and were not a proper basis for probable cause to arrest and charge plaintiff for any criminal conduct.

154.    On June 24, 1983, plaintiff was indicted (Kings County Indictment No. 3521/83), along with co-defendant Cy Greene, for murder in the second degree in two counts – intentional murder and felony murder – and for robbery in the first degree, in connection with the murder and

robbery of John Choi on June 14, 1983. In the indictment, it was alleged that Cy Greene stabbed Choi and caused his death.

155.   A pre-trial suppression hearing was held before Justice Joseph Lombardo in December 1984, at which defendant Detectives Norrito and Tumbarello testified, as well as Cy Greene and plaintiff. Jae Kim did not testify. Plaintiff and Cy Greene claimed that their lineups were inexorably tainted by the fact that an Asian man (Jae Kim) was allowed to observe them in a jail cell before they were identified in lineups. Justice Lombardo found the latter testimony not credible, even though Detectives Norrito and Tumbarello could not testify that they were with Kim throughout the period before the lineups.

**The Criminal Trial**

156.   Plaintiff and Cy Greene were represented by separate defense counsel at their trial in the Spring of 1985.

157.   At their criminal trial, both plaintiff and his co-defendant Cy Greene presented alibis and defenses of mistaken identity, wrongful identification, and innocence. Their contentions included the lack of credibility of the prosecution witnesses.

158.   Various police and civilian witnesses testified, including, without limitation, plaintiff and Cy Greene, and alibi witnesses on their behalf. Over defense counsel's objection, defendants Norrito and Tumbarello improperly offered Mark Best's hearsay identifications of the defendants and his hearsay version of the crime to bolster Jae Kim's testimony.

159.   At the 1985 trial, the sole eyewitness who offered admissible evidence for the prosecution, Jae Kim, and the only witness/evidence linking plaintiff and Cy Greene to the crime, identified Cy Greene as John Choi's stabber and plaintiff as a participating accomplice.

160.   Significantly, the individual who had originally caused Cy Greene and plaintiff to be placed in lineups before Jae Kim (Mark Best), did not testify, with the prosecution claiming that

they could not locate him.  Defendant Norrito has since admitted that he always knew where to find Mark Best, a fact that seriously undermines the latter contention by the prosecution.

161.    Kim testified that he was a friend of John Choi and was with him when Choi was attacked and robbed.

162.    It was established at trial that Kim initially told the police the stabber was 6 feet tall and later reportedly said he was 5 feet 9 inches.

163.    Again, on June 14, 1983, Cy Greene was approximately 5 feet 1 inches tall.

164.    That height difference of 11 to 7 inches between witness Kim's description of the stabber and Cy Greene's much shorter height was a crucial issue in the case.

165.    The height difference was a crucial discrepancy before plaintiff and Cy Greene were arrested and continued to be so throughout all subsequent proceedings.

166.    The defendants and related persons knew from the time they contemplated taking plaintiff into custody that the height difference would have to be disregarded in determining whether there was probable cause to arrest Cy Greene and plaintiff and would have to be undermined as an issue in order to charge and prosecute them.

167.    On May 8, 1985, following a jury trial held before Justice Michael L. Pesce in Supreme Court, Kings County, and after over two days of jury deliberations, despite the alibis offered by the two defendants, Cy Greene was acquitted of intentional murder but convicted of felony murder and robbery in the second degree, while plaintiff was convicted of robbery in the first degree, based solely on the eyewitness identifications and testimony of Jae Kim (and the hearsay testimony of Detectives Norrito and Tumbarello who were allowed to convey Mark Best's account of the crime and his identification of Cy Greene as the stabber).

**Law Enforcement Withheld Critical Exculpatory Evidence**

168.    What plaintiff and Cy Greene did not know in 1985 was that two NYPD informants were involved in the robbery and murder of John Choi (including Mark Best), and that law enforcement intentionally secreted their involvement, along with critical eyewitness information (recorded statements) that remains secreted today despite numerous requests that this evidence be produced.

169.    The defendants and related persons did, and conspired to do so, by suppression and non-disclosure of exculpatory evidence favorable to plaintiff, by improper manipulation of evidence, by related deceits and falsifications regarding the actual perpetrators, and by manipulating and/or concealing other significant factual evidence that developed from the arrest through grand jury, pre-trial, trial and post-conviction proceedings, to convict plaintiff, deny him a fair trial and unjustly convict and imprison him.

170.    The individual defendants and related persons, upon information and belief, jointly engaged and assisted each other in carrying out the various actions described herein (protecting the two NYPD informants described below and preserving the arrests and convictions of plaintiff and Cy Greene) and further lent their presence and support to each other in furthering the aforementioned conspiracy by the secreting acts described below.

171.    Without limiting the foregoing, the defendants and related persons described herein wrongfully caused plaintiff to be indicted and prosecuted by concealing the identities, nationalities, deals/immunities granted to their two informants, and the informants' involvement in the crime in the presentation to the grand jurors; and the defendants and related persons were able to wrongfully obtain a conviction at trial by deceitfully concealing certain evidence when presenting the case to the petit jury, and then wrongfully opposed post-conviction motions of plaintiff and Cy Greene by continuing to withhold exculpatory evidence.

172.    Plaintiff's conviction at trial would not have been possible, and, in any event, certainly would not have been successful, but for the wrongful acts and omissions of defendants and related persons described in greater detail below.

173.    Plaintiff's conviction for robbery, first degree, resulted in his being sentenced on May 31, 1985 to an aggregate minimum of four years and six months and an aggregate maximum of nine years, and this first wrongful conviction ultimately increased his sentences on subsequent criminal convictions.

174.    Cy Greene was convicted of felony murder and robbery in the second degree and he was sentenced to concurrent terms of an aggregate minimum of fifteen years and an aggregate maximum of life on the felony murder conviction and an aggregate minimum of two years and an aggregate maximum of six years on the robbery, second degree, conviction.

175.    Plaintiff served his sentence at various New York State Correctional Facilities and in the City jail at Rikers Island until he was released on parole on May 31, 1988.

176.    Plaintiff only recently learned about the fraud/misconduct of the defendants described below after his co-defendant Cy Greene, who successfully vacated his conviction in 2006, and pursued a civil rights action against various individuals and entities involved in the John Choi murder investigation and obtained additional evidence from them;[1] plaintiff's counsel was thereafter unsuccessful in convincing the state criminal trial and appellate courts that police and prosecutors should finally turn over secreted evidence when he brought a post-conviction motion before those courts (resulting in a denial of discovery, and appellate review denials, up and through a denial of plaintiff's motion for leave to appeal by the New York State Court of Appeals on August 20, 2019).

---

[1]      The conspiring defendants effectively blocked any hope that plaintiff could file a successful *habeas corpus* petition while he was in custody by secreting valuable exculpatory evidence, including witness statements, actual perpetrator identifications, and deals and immunities granted to two NYPD informants.

**Plaintiff's Co-Defendant, Cy Greene, Successfully Vacates His 1985 Conviction**

177.    On January 4, 2006, after a proceeding commenced in December 2003 under New York State Criminal Procedure Law § 440.10, including evidentiary hearings during which witnesses testimony and numerous documents were produced and introduced, Cy Greene's conviction was vacated in a Decision and Order by Justice Pesce, the same judge who had presided at the 1985 criminal trial.

178.    Cy Greene was then granted a new trial based on his trial counsel's alleged "inadequate representation."

179.    Cy Greene was released from custody in January 2006, after having served over 22 and a half years in prison.

180.    The People appealed, seeking to reverse Justice Pesce's Decision and Order.

181.    On February 13, 2007, the Appellate Division affirmed the trial court's decision vacating of Cy Greene's unlawful conviction. *People v. Greene*, 37 A.D.3d 615, 828 N.Y.S.2d 816 (2d Dep't 2007).  The People's application for leave to appeal was denied by the Court of Appeals. *People v. Greene*, 8 N.Y.2d 985 (2007).

182.    On June 11, 2008, on motion of the Kings County District Attorney office, Cy Greene's indictment was voluntarily dismissed by the KCDAO when prosecutors announced in court their "absolute inability to retry this case."

**The Facts Surrounding the Defendants' Misconduct**

183.    Plaintiff's robbery conviction was wrongful and unjust.  Newly-discovered evidence – evidence that is still being intentionally secreted by police and prosecutors, evidence that plaintiff can prove still exists – allows him finally now to prove his actual innocence and the continuing fraud/misconduct of law enforcement.

184.    The convictions of plaintiff and Cy Greene in 1985 were based on the weakest of evidence – a very suspect eyewitness identification[2] by a single, traumatized witness making a cross-racial identifications.[3]    Jae Kim, the victim's companion and a recent Korean immigrant, identified plaintiff and Cy Greene, two black men, after being improperly allowed to view them seated together in a jail cell just prior to lineups, one week after the murder.  Transcripts of Dec. 14, 1984 and Dec. 19, 1984 Wade Hearings ("Wade") 126-128, 131-132, 136-137, 151-153.

185.    In fact, Mr. Greene's conviction alone was vacated in January 2006 based on a series of CPL 440 hearings conducted by his attorney during which, among other things, three issues were highlighted: (1) Cy Greene's actual innocence, (2) law enforcement misconduct, and (3) the incompetence of his trial counsel.

186.    Plaintiff was unaware of the specific evidence brought out in Cy Greene's post-conviction proceedings and, to this day, still has an incomplete understanding of what police and prosecutors withheld and continue to withhold (he does know, however, that evidence is still being secreted).

187.    The most significant evidence submitted by Mr. Greene to the criminal court during his hearing up and until his conviction was vacated was the sworn testimony of two witnesses (Messrs. Leonardo Best and Ruperto Lindsay) who detailed the confessions of three of John Choi's

---

[2]    This eyewitness initially described the stabber as a black man who was six feet tall; this witness secretly admitted to the NYPD that he only "*possibly can*" identify the man who stabbed Choi (this latter admission was not disclosed to plaintiff or Cy Greene until after Cy Greene's conviction was vacated). Mr. Greene is 5'1" black man.   The trial judge himself later confessed that he "was concerned about the jury's verdict . . . [because he] believed that the eyewitness identification [by Jae Kim] was weak – particularly the description of the assailant as someone six feet tall; Mr. Greene is approximately 5'1" or so.").

[3]    *See, e.g., People v. Boone*, 30 *N.Y.3d* 521 (*2017*) ("In light of the near consensus among cognitive and social psychologists that people have significantly greater difficulty in accurately identifying members of a different race than in accurately identifying members of their own race, the risk of wrongful convictions involving cross-racial identifications demands a new approach.  We hold that when identification is an issue in a criminal case and the identifying witness and defendant appear to be of different races, upon request, a party is entitled to a charge on cross-racial identification.").

actual assailants regarding their role in the murder.  *See* 2006 CPL 440 Order vacating Mr. Greene's conviction.

188.    During Cy Greene's 2005 440 hearings, Leonardo Best testified that his brother, Mark Best, and his brother's friend, William Patterson, admitted to him a day or two after the murder that they participated in John Choi's robbery/murder with a few "Panamanians" and that a man named "Panama" stabbed John Choi.  *See also* Affidavit of Mark Best dated Feb. 26, 1991 at ¶¶ 9-10 ("In fact, the guy who did the stabbing was named Panama.  It was not the defendant [Cy Greene].  I know this from my own observation.  I do not know Panama's real name or where Panama resides since I knew him from the street.").

189.    During the 2005 440 hearings, Ruperto Lindsay, a Panamanian, testified that he personally witnessed two fellow Panamanians fleeing the subway station crime scene (Anthony Bowers and Rudolpho Brown).[4]  He also testified that, a few days after the murder, Rudolpho Brown confessed to him that he was the one who stabbed Mr. Choi.

190.    Plaintiff's and Mr. Greene's 1985 criminal trial judge, Justice Michael Pesce, who also issued the 2006 ruling vacating Mr. Greene's conviction,[5] would explicitly express his *only* reservation as to Mr. Greene's innocence claim and the confession testimony of the three assailants in a March 28, 2005 in-court colloquy (and, implicitly, the innocence of plaintiff):

---

[4]    In 2005 at a 440 hearing, and at a more recent deposition, Lindsay identified three of Kim's actual assailants: Panamanian men then well-known to Lindsay, who he personally observed fleeing the subway station crime scene.  Acting on the information then available in 2005-2006, however, Justice Pesce did not deem Lindsay's testimony credible [Decision 1/4/06].  Very significantly, Justice Pesce did not know in 2005-2006 that Detective Michael Norrito had interviewed at least two of these men seen fleeing the crime scene and that Norrito would confirm that they were, indeed, Panamanian, as claimed by Lindsay, and Spanish-speaking, as confirmed by cab driver, Reynold Guerrier (see discussion below).

[5]    Notably, between 1985 and 2006, Justice Pesce wrote to the Parole Board on Mr. Greene's behalf on two separate occasions because the jury's guilty verdict in plaintiff's and Mr. Greene's case troubled him for decades.  R. 1392 ("I was concerned about the jury's verdict . . . I thought the evidence was not as overwhelming as it appeared to the jury.  I believed that the eyewitness identification [by Jae Kim] was weak – particularly the description of the assailant [stabber] as someone six feet tall; Mr. Greene is approximately 5'1" or so.").

"It is this Court's opinion that while the individuals [making confessions] who have made declarations against their penal interest knew that they were so making such a statement, I think Mr. Beldock [Mr. Cy Greene's then-attorney] has yet to establish that there is indicia independent of the statements made by the individuals of the[ir] reliability and truthfulness, perhaps, of those statements made by the individuals. Those aspects, that criteria, have not yet been established … So, I will give Mr. Beldock an opportunity to do so, and, I will hold that part of the motion, again, in abeyance until you present to the court any indicia that those statements are somewhat – are reliable, and that they're truthful."

191.    The corroborating evidence Justice Pesce sought, to convince him of the reliability of the three confessions in 2005, plaintiff can only now provide through the more recent admissions of Detective Norrito (that he interviewed the men in Guerrier's cab after they were identified by an NYPD informant and that these men were, indeed, Panamanian), and, circumstantially, through proof of what Guerrier reported to law enforcement (the men in his cab were Spanish-speaking); this latter (direct evidence) is still being secreted by the defendants.

192.    Plaintiff can now show, circumstantially (and not by direct prosecution admission), that a wealth of exculpatory material was wrongfully and intentionally secreted and fabricated by police and prosecutors, for over three decades (and some of it is still being secreted today): (1) to protect two police informants (Mark Best and Eduardo Furto) who participated in the murder, (2) to protect the arrest and conviction of plaintiff and Cy Greene, and (3) to cover-up law enforcement misconduct. This secreted evidence completely corroborates the confessions described above.

193.    Plaintiff can now finally show that he had nothing to do with the robbery/murder of John Choi through: the confessions of three of the actual assailants, the statements of eyewitnesses that corroborate these confessions, the statements of a particular eyewitness (Reynold Guerrier – cab driver) whose interview was secreted but who advised that three of the assailants spoke Spanish and that the man with the brown shirt was 5'10" tall, the recent (post-conviction-indictment dismissal) admissions of Detective Michael Norrito (Norrito interviewed the men seen fleeing the murder scene, who were identified by an NYPD informant, and Norrito determined that they were Panamanian), plaintiff's and Cy Greene's alibis, the DNA profile (an unknown male profile) culled

from the murder weapon (a knife), and a fingerprint left by one of the assailants in the taxi cab seen fleeing the crime scene, which was not left by plaintiff or Cy Greene. Civil rights violations by the defendants herein have heretofore prevented plaintiff from establishing his innocence and the misconduct described more fully below.

194. As a result of law enforcement's fraud/misconduct (a continued concealment of exculpatory evidence), plaintiff's conviction has never been vacated and Cy Greene's conviction for murder was not vacated properly and justly in 2006, based on his actual innocence, but instead his conviction was vacated based only on his trial attorney's alleged "ineffective assistance," for Cy Greene's then-inability (in 2005-2006) to produce sufficient evidence to "corroborate" the three confessions (and law enforcement misconduct) he offered in evidence; plaintiff's conviction remains unjustly intact. A portion of the evidence corroborating those confessions is, remarkably, still being secreted by law enforcement, even though the plaintiff can establish that it exists.

195. While plaintiff sought to have his own 1985 conviction vacated in 2017 based on (a) his own actual innocence, (b) law enforcement misconduct and (c) his trial attorney's "ineffective assistance," his CPL 440 motion was summarily denied by the Supreme Court of the State of New York, County of Kings (Mangano, J.) without an evidentiary hearing (or any discovery from prosecutors) on March 19, 2018, and that decision was left untouched by the Appellate Division, Second Department (on March 17, 2019) when plaintiff's motion for leave to appeal was denied, and by the New York Court of Appeals (on August 20, 2019) when a second motion seeking leave to appeal was denied.

196. In short, plaintiff has exhausted his attempts to obtain relief in the courts of New York State and is left with only his civil rights claims (principally § 1983) for money damages within this action.

**The Evidence That Is Still Being Intentionally Secreted by Law Enforcement**

197.    Throughout every court proceeding following plaintiff's 1985 conviction arising out of the robbery/murder of John Choi, Cy Greene, plaintiff and the criminal court did not know that a fraud was then still being perpetrated upon them – police and prosecutors were then and still are intentionally secreting, among other things, two of the most vital pieces of evidence in the case that corroborate the three confessions brought before Justice Pesce in 2005:

(a) immunity/deals offered by law enforcement to two of the victim's actual assailants;

(b) the audiotape and transcript of an interview conducted by an assistant district attorney and the two lead detectives of a vital witness who stated that three men, who were chased to his cab from the subway murder scene, were Spanish-speaking and that the man chased to his cab with the distinctive brown shirt, who stabbed Mr. Choi, was 5'10" tall (Mr. Greene is 5'1" tall and neither plaintiff nor Mr. Greene speak Spanish), and

(c) the names and nationality of the three assailants who were chased directly from the crime scene to the taxi cab operated by Reynold Guerrier, who were identified and interviewed by Detective Michael Norrito.

**A. The Secreted Informants**

198.    Two New York City Police Department ("NYPD") informants, Mark Best and Eduardo "Fulo" Furto, participated in the murder of John Choi.  Although ADA Gerald Greene twice denied, falsely, at trial that a "deal" had <u>not</u> been made with "witness" Mark Best,[6] post-2006-conviction-indictment-dismissal testimony and documents establish that Mark Best and Eduardo

---

[6]    Defense counsel had specifically requested of ADA Gerald Greene two times, in front of Justice Pesce, that ADA Greene provide the defense with all impeachment material relating to Mark Best, the initial primary witness for the People.  ADA Greene falsely replied that it had all been provided. It was Mark Best who first identified Mr. Greene as John Choi's stabber and caused Mr. Greene and plaintiff to appear before Jae Kim in lineups, but Best allegedly was unavailable to testify at plaintiff's trial in 1985.

Furto were NYPD informants who received secreted immunity/deals from law enforcement.[7]   The

intentional and continued secretion of the deals/immunity granted to these men, despite an explicit

court order to investigate and advise whether a deal was formed with Mark Best, constitutes fraud

and undeniable Constitutional violations that seriously harmed plaintiff (harm that the state courts

have yet to recognize or acknowledge).

### Informant-Assailant Mark Best

199.    Post-murder-conviction, Mark Best himself submitted two affidavits to Justice Pesce

admitting that he was an NYPD informant and that he had been promised a "deal," pretrial, if he

assisted with the prosecution of plaintiff and Cy Greene.[8]

200.    When these Best affidavits were submitted to the court, Justice Pesce explicitly

ordered the KCDAO to perform an investigation and report back on the nature of the relationship

the KCDAO had with Mark Best.[9]

---

[7]    ADAs Kallen and Greene undeniably knew that a "deal" had been formulated and offered to
Mark Best for his testimony against plaintiff and Cy Greene, but this important evidence was not
disclosed.  ADA Kallen's handwritten trial notes, belatedly produced to Cy Greene during discovery
in the latter's civil rights case, establish that Kallen offered an explicit deal to Mark Best that was
never disclosed to criminal defense counsel.  ADA Greene knew this from Kallen's notes in the
prosecution file, as did every other prosecutor within the KCDAO, including ADA Mintz and DA
Gonzalez, both of whom were administratively responsible for producing information, requested by
the court (Judge Pesce), to Judge Pesce and criminal and civil counsel representing the criminal
defendants, in subsequent court proceedings.

[8]    Mark Best has said in a sworn affidavit: "I did so [implicate Cy Greene] because of the threats
that had been previously made [by Detective Norrito] and also because I was told by the police that
they could get me a job in a laundromat.  In fact, the police officer [Norrito] did get me a job in a
laundromat (I believe the officer was associated with the laundromat)."  Affidavit of Mark Best
dated February 26, 1991, ¶ 7.  Mark Best was "instructed by both the District Attorney and the
detectives to keep my mouth shout about anything that I may have to do with the crime."  Affidavit
of Hassan (Mark) Best April 29, 1992, ¶ 5.  This sworn affidavit shows that law enforcement
intentionally secreted Best's immunity/deal, in light of ADA Kallen's corroborating pretrial notes.

[9]    Mark Best did not testify at the trial, but his hearsay account of the crime was improperly
conveyed to the jury, over defense counsel's objections.   The effect of Mark Best's out-of-court
"testimony" is evident from the very fact that the jurors only had one question during their
deliberations: "We would like to know about Detective Norrito's having anything to do with Mark

201.     As detailed in a memo from ADA Amy Appelbaum to ADA Roseann Mackechnie, following a court hearing held on January 8, 1992, ADA Appelbaum reported the following instructions to her superiors from Justice Pesce (emphasis added):

> On January 8, 1992 . . . **Justice Pesce stated that he was reserving decision [on Mr. Greene's second C.P.L. § 440.10 motion] pending an investigation by our office into Mark Best's allegations.**   More specifically, he instructed us to use all available resources to investigate the credibility of [Mark] Best's allegations.  He said that from the beginning, he thought that Best may have had either a greater or different type of involvement with this case than the evidence indicates.  He wants us to conduct this investigation within the next thirty days, and he wants to know who will be handling it by next week . . . **Justice Pesce wants a well-documented report of the investigation** . . . He said that if the attorneys handling it are having trouble getting the support they need to do a thorough job or if he is dissatisfied with their work, he will contact District Attorney Hynes and impress upon him the need for this investigation . . . Justice Pesce expressed concern about the possibility of adverse publicity emanating from this case.  He said that he would not want this case to attract the type of negative publicity that other cases prosecuted by the District Attorney's Office have attracted.

202.     Despite Justice Pesce's suspicions, threats and explicit order, the KCDAO did not conduct the thorough investigation he ordered; in response, the KCDAO allegedly interviewed Mark Best, *see People v. Greene*, Indictment No. 3521/83 (Pesce, J., Nov. 12, 1993); the KCDAO did not disclose that its office considered Mark Best a "Co-Defendant" who was offered immunity and a deal in exchange for his cooperation against the defendants in the John Choi murder investigation.  ADA Gerald Greene lied about this fact at trial.  Subsequent frauds were then perpetrated upon Justice Pesce (post-trial in 1992 and in 2005-2006) during Cy Greene's CPL 440 Motion hearings, and then before Judge Donnelly during Cy Greene's civil rights action, and then in the People's response to plaintiff's CPL 440 motion – all of these frauds (in investigating the true nature of law enforcement's relationship with Mark Best) – void any alleged "absolute immunity" claimed by the prosecutor defendants herein, who refused to review their files, perform a proper investigation, and disclose ADA Kallen's notes and deal terms formed with Mark Best.

---

Best."  Trial Tr. 772.  The jurors "smelled a rat" and a deal, a deal that would not be disclosed for almost three decades.

203.   The KCDAO secreted the "immunity/deal" it made with Mark Best *until November 27, 2012*, when ADA Douglas Kallen's trial preparation notes were finally ordered produced to Mr. Greene in the latter's civil rights case.

204.   ADA Kallen acknowledged in sworn testimony, *in 2013*, that a "deal" existed between the KCDAO and Mark Best (Kallen Dep. 144-145) and that he "absolutely" intended to disclose it at trial (*id*.).

205.   This "immunity/deal" was secreted, however, when ADA Kallen was replaced as the trial prosecutor shortly before trial; Kallen's successor, ADA Gerald Greene, wrongfully denied the existence of a deal with Best and refused to disclose the deal's terms on two separate occasions at trial.

206.   Secreted KCDAO documents, also belatedly produced post-trial, show that the KCDAO was referring to Best internally as a "Co-Defendant."   *See* Handwritten Notes on Best Interview DD-5.  This secretion was intentional and devastating to plaintiff and Cy Greene.

207.   In short, proof of the deal formed with Mark Best was in the KCDAO's files, but it was never produced to Justice Pesce, Cy Greene or to plaintiff (and its existence has been denied in open court by counsel for the City); to this very day, the KCDAO has wrongfully secreted and denied its true relationship with Mark Best (assailant and immunized informant) in court proceedings.

**Informant-Assailant Eduardo "Fulo" Furto**

208.   In 2009, Detective Michael Norrito finally admitted under oath that he learned that an NYPD "confidential informant" was present in Reynold Guerrier's cab seen fleeing the murder scene, from a Panamanian police officer named Roberto Carter, who was stationed with Norrito at the 67th Precinct; Carter was the NYPD "handler" for this gang informant.  Norrito Dep. [1/9/09] at 151:13-14.

209.   Implicit in Detective Norrito's admissions is the fact that this informant, believed to be Eduardo "Fulo" Furto, must have conveyed to Officer Carter that he (a Panamanian) was involved in the crime.   No other plausible explanation exists for police officer Carter advising Detective Norrito that his informant was in Guerrier's cab, because Carter was not involved in the Choi murder investigation.

210.   Based on connected eyewitness statements, the men in Guerrier's cab were undeniably part of the group that robbed/murdered John Choi because they were chased directly from the subway crime scene to that cab.  *See* Diagram/Map of Eyewitness Statements (**Exhibit A** hereto), and *see especially* the police report on the statements of eyewitness James Robinson who chased a "male Black 6' Med build small afro wearing a brown shirt and pants" to and into a taxi cab bearing a license plate issued to Reynold Guerrier.

211.   At trial, before the jury, Detective Norrito falsely opined and testified: "Counselor, the cab had nothing to do with this case at all." (Trial Tr. at 170:7-8) and "It [Guerrier's cab] was irrelevant to this case.") (*id.* at 183:2 ).  Plaintiff now can show that this testimony by Norrito was blatantly false based on eyewitness statements and Norrito's own recent admissions.

212.   In spite of the fact that this informant, believed to be Eduardo Furto, was an undeniably significant witness and one of the likely perpetrators, this informant was protected and immunized, and the criminal court and defense counsel were never advised of his identity, or the simple exonerating fact that three Panamanians chased to Guerrier's cab were involved in the crime.

213.   Norrito's knowledge that Panamanians were present in the cab seen fleeing the crime scene is imputable to prosecutors,[10] and law enforcement did not disclose this fact to Justice Pesce, and this misconduct became especially acute when Justice Pesce was considering the reliability of

_____

10    "[T]his Court has charged the People with knowledge of exculpatory information in the possession of the local police, notwithstanding the trial prosecutor's own lack of knowledge." *People v. Santorelli*, 95 N.Y.2d 412, 421 (2000).

confession testimony about Panamanians being involved in the crime. Again, a fraud was perpetrated by law enforcement upon the court by withholding that information and it continues today because prosecutors[11] still have not identified the informant or the immunity/deal he was promised.

### B. The Secreted Cab Driver Interview Audiotape & Transcript

214. A vitally important but secreted interview was conducted by an Assistant District Attorney (ADA Robert M. Sullivan), and the two lead detectives (Detectives Michael Norrito and Joseph Tumbarello), of a cab driver (Reynold Guerrier) seen leaving the scene of the crime with three passengers (three of the assailants were chased to that cab, including the brown-shirted man who stabbed John Choi) the evening of the murder. *See* Diagram/Map of Eyewitness Statements (**Exhibit A**).

215. The audiotape, transcript and handwritten notes of the detectives of this very important interview were *intentionally* secreted because, as seen above, one of the cab passengers was an NYPD Panamanian gang informant and the information collected from the cab driver not only implicated the informant (Eduardo Furto) in the crime, but it also established that the tall, brown-shirted man (Choi's stabber: Rudolpho Brown), who was chased directly to this cab, was 5'10" tall and was Spanish-speaking (Mr. Greene is 5'1" tall and neither plaintiff nor Mr. Greene speak Spanish).

216. The production of this interview tape and transcript would have terminated the prosecution of plaintiff shortly after his arrest.

217. Remarkably, Detective Norrito testified falsely at the trial that he had never interviewed Guerrier. Trial Tr. 164:22 to 165:2 ("Q. Did you speak to a cab driver at all? A. I did

---

[11]     This fact allows plaintiff to claim that defendant ADAs Sullivan, Kallen, Greene, Mintz and DA Gonzalez are liable for failing to disclose this exculpatory information to plaintiff, gathered by ADA Sullivan.

not.  No.  Q.  Did not?  A.  No.").  This trial testimony as will be seen below was, again, patently false as Norrito was present during this second Guerrier interview.

218.    No police report was ever completed regarding this second Guerrier interview (or the subsequent cab passenger interviews).

219.    And the audiotape and the transcript of this vitally important interview of Reynold Guerrier have yet to be produced to plaintiff, even though he can now show that these items exist[ed] based on two unassailable facts.

220.    *First*, the transcript itself was briefly viewed in court personally by Mr. Greene's then-attorney, one of this country's most-respected civil rights lawyers, Myron Beldock, in 2004 (its existence is, therefore, undeniable); in a court-filed affidavit, Mr. Beldock swore that he briefly observed this transcript while reviewing KCDAO documents produced in court for an "inspection":

> [¶ 2] I first learned about this issue when in late July [2004] I reviewed papers forwarded by Justice Rivera to Justice Pesce.  Those papers included a transcript of the June 14, 1983 precinct statement from a cab driver, one Reynold Guerrier, taken by A.D.A Sullivan in the presence of Detectives Norrito and Tumbarello, which contains previously undisclosed material evidence.* [* footnote: "I do not have a copy of that transcript.  In a separate letter I am asking the court to allow me to copy it to submit as an exhibit in this proceeding."]  Mr. Guerrier was a taxi driver whose cab was commandeered by three men.  Another person, James Robinson, had chased one of these men [the brown-shirted man who stabbed John Choi] as he ran on Nostrand and Church Avenue and saw that man get into the cab to join two others already there. . . .

> [¶ 3]  . . . the significant material evidence I learned when I examined the precinct statement of cab driver Guerrier at Justice Pesce's chambers [was]: that three men who came into the cab were speaking Spanish.  Neither Cy Greene nor [co-defendant] Larry Williams are Spanish speaking persons.  The police and prosecutor were aware of this exculpatory evidence, which would in itself have impeached the credibility of their investigation as well as the identification of Mr. Greene (and Mr. Williams) by eyewitness [Jae] Kim.  That information should have been disclosed to the defense and the failure to do so was a violation of defendant's state and federal rights to a fair trial and due process of law.

Second Reply Affirmation in Support of Motion to Vacate, dated September 22, 2004, ¶¶ 2–3).

221.    According to attorney Beldock, this transcript shows that Norrito was present at the Guerrier interview, despite his false testimony at trial.  *Id.*

222.   *Second*, in 2012, Mr. Greene finally received Detective Joseph Tumbarello's handwritten notes of the Guerrier interview showing that Tumbarello was present when this important, secreted information was learned from Guerrier the evening of the murder.  Tumbarello's Notebook (Guerrier Interview Notes).

223.   Despite numerous requests for the Guerrier interview audiotape and transcript in 2004 and years following (by Cy Greene and then by plaintiff subsequently), the KCDAO has neither produced them, nor explained their "loss."  Most of the individual defendants named in this action – Detectives Norrito and Tumbarello, ADAs Sullivan, Kallen, Greene and Mintz, and DA Gonzalez – bear responsibility for not producing these two items from within the KCDAO's files for over three decades.  If this evidence is not produced, plaintiff will seek relief for "spoliation."

224.   Despite the fact that all other audiotapes and transcripts of eyewitness interviews conducted by ADA Sullivan and Detectives Norrito and Tumbarello the evening of John Choi's murder were produced to Cy Greene and his counsel after his indictment was dismissed – very notably, prosecutors intentionally continued to secrete the Guerrier interview audiotape and transcript.[12]

225.   These facts have just become known to this plaintiff following the Court of Appeals' denial of his motion for leave to appeal (and all hope of proving misconduct in the state courts was squashed).

---

[12]   ADA Mintz turned over the Kim precinct statement audiotape sometime after September 3, 2003 (*see* Beldock Affirmation 12/01/03 at ¶ 7).  And she turned over to Mr. Beldock the audiotape of the Mark Best precinct interview of June 16, 1983, and the audiotape of the Abdul Rahman interview of June 14, 1983 on April 7, 2005 (Transcript of Hearing of Apr. 7, 2005 at 4:15-24). Remarkably, while turning over these audiotapes, selectively, to attorney Beldock (Cy Greene), she wrongfully elected to withhold the audiotape and transcript of the Reynold Guerrier interview.  DA Gonzalez ultimately followed the same wrongful path when plaintiff and Cy Greene appealed to him directly for these items.

### C.     The Secreted Identities of the Cab Passengers Chased from the Crime Scene

226.     The two eyewitnesses, Abdul Rahman and Jae Kim,[13] who observed the stabbing, told the police that the stabber was wearing a distinctive brown shirt.

227.     Eyewitness James Robinson chased the brown-shirted man seen fleeing the subway station where Choi was murdered to Reynold Guerrier's cab.

228.     The men in Mr. Guerrier's cab were with the brown-shirted man, whose movements were directly traced from eyewitnesses Jae Kim-to-Abdul Rahman-to-Eric Head-to-Lavaughn Ryan-to-James Robinson-to-Reynold Guerrier, so these cab passengers were an integral "part of the group involved in this incident."  *See* Map/Diagram Showing Path of Brown-Shirted Stabber (**Ex. A**).

229.     The street-level eyewitnesses produced an unbroken chain of observations from the subway station exit to Church Avenue, to Lloyd Street, and then to the corner of Erasmus Street and Veronica Place, where the fleeing men (chased by eyewitness, James Robinson) entered a taxicab operated by Reynold Guerrier.

230.     James Robinson was "in the area of Nostrand and Church Avenue [near the exit from the subway station murder scene]" when "a man told me to stop a man who was running." Robinson chased this "male Black 6' Med build small afro wearing a brown shirt and pants" to and into a taxi cab bearing a license plate issued to Reynold Guerrier, where other men were present.

231.     How did Detective Norrito identify and interview the men chased to Guerrier's cab? Why didn't he reveal their identities and compile notes and file a report on what he learned during his interviews of these men?

---

[13]     The distinguishing features of the perpetrator who stabbed Choi with a knife were his height and his chocolate brown shirt.  Kim's references to the brown shirt in particular abound throughout his statements taken the same day as the crime.  *See, e.g.*, Kim Interview Transcript at 3: "one of black guys, tall guy, he puts on the brown chocolate jacket . . . the one with the chocolate jacket, he got the knife"); Audiotape of Kim Interview; Norrito Notebook re: Interview of Jae Kim: "The guy with the brown shirt stabbed [sic] him."; DD-5 of Kim Interview: "Witness describes male with knife as . . . [wearing] chocolate colored shirt."

232.    Detective Norrito chose not to identify the men in Guerrier's cab because one of them was an NYPD informant, believed to be Eduardo Furto, and Furto would have been implicated in the murder.

233.    It was not until he was deposed in 2009 by Cy Greene's then-attorney (Beldock) that Detective Norrito finally provided some details about this informant and the information that this "snitch" provided to law enforcement.

234.    Still attempting to protect himself, however, Norrito testified that he "cannot recall" whether "[officer] Carter gave me the address to go see these people or he gave me the address or how I found out the address.  It's not clear in my mind, but somehow I went to go see these people. I interviewed them. I don't remember the time. . . ."  Norrito Dep. 153:3-10.

235.    Again, based on eyewitness statements, these men in Guerrier's cab were undeniably the victim's assailants because they were chased directly from the crime scene to Reynold Guerrier's cab.  *See* Diagram/Map of Eyewitness Statements (**Exhibit A**).

236.    Norrito belatedly admitted to Cy Greene's then attorney (Beldock) that he interviewed two of Guerrier's passengers, but Norrito has never identified the NYPD informant or the immunity he apparently he provided the informant; he has never identified the men he interviewed; he has never produced any notes regarding these interviews, and he never completed a formal report on these interviews.

237.    Again, at trial before the jury, Norrito falsely testified: "Counselor, the cab had nothing to do with this case at all." (Trial Tr. at 170:7-8) and "It [Guerrier's cab] was irrelevant to this case.") (*id.* at 183:2).

238.    Nevertheless, Norrito's admission in 2009 – that the two cab passengers that were identified and then interviewed by him were "Panamanian" (Norrito Dep. January 9, 2009 at 135-

137) – is a vitally important fact that wholly corroborates the confessions described above and, thereby, shows the blatant misconduct of the defendants in secreting this exculpatory evidence.[14]

239.    The City and the KCDAO have continued to secrete the role of the informants, the deals made with these informants, the Guerrier interview and audiotape, and the identities and nationalities of the men in Guerrier's cab, even up to and through today, even though plaintiff can now show circumstantially that this evidence exists and that it conclusively corroborates the three confessions of the actual assailants (and the eyewitness testimony of Ruperto Lindsay[15]).  The state courts unbelievably have rejected any attempt by plaintiff to compel this evidence from law enforcement.

240.    In sum, Justice Pesce did not have very important corroborating evidence before him in 2005-2006 when he vacated Mr. Greene's conviction due to the intentional, continued secretion of evidence by police and prosecutors; plaintiff has been wholly without this evidence and its effect, and he has only recently learned of its significance (once his state court appeals were exhausted).

241.    While Justice Pesce *did know* that: (a) eyewitnesses watched (and one chased) three perpetrators flee into a cab (*see* Map/Diagram, **Exhibit A**), Justice Pesce and the criminal defendants before him *did not know:* (b) that a deal/immunity was given to alleged eyewitness Mark Best and an implicit deal/immunity was given to informant Eduardo Furto (newly-discovered and not yet disclosed and admitted by law enforcement), (c) that a cab driver (Guerrier) seen fleeing the

---

[14]    This should have been disclosed to Judge Pesce when he stated in open court that he was seeking evidence that would corroborate the confession testimony elicited by Cy Greene's counsel during 2005 court proceedings.  Again, "this Court has charged the People with knowledge of exculpatory information in the possession of the local police, notwithstanding the trial prosecutor's own lack of knowledge."  *People v. Santorelli*, 95 N.Y.2d 412, 421 (2000).

[15]    Acting on the information then available in 2006, Justice Pesce did not deem Lindsay's testimony credible [Decision 1/4/06].  Very significantly, Justice Pesce did not know at that time that Norrito had interviewed at least two of these men and that Norrito would confirm that they were Panamanian, as claimed by Lindsay and Lenny Best, and Spanish-speaking, as confirmed by Guerrier.

crime scene advised police and prosecutors during an undisclosed (taped) interview that the men who entered his cab spoke Spanish and that the cab driver described the brown-shirted man as being 5'10" tall (newly-discovered and still being fraudulently concealed), and, more importantly, that (d) the lead detective, Michael Norrito, identified these men, interviewed them and determined that they were, in fact, Panamanian (newly-discovered), and that Norrito still refuses to name them. Thus, the confessions of Mark Best, William Patterson and Rudolpho Brown, that three Panamanians were involved in the Choi murder (along with Best and Patterson), fit the known eyewitness statements and the alibi of plaintiff (and his co-defendant) "like a glove," along with the fact that the DNA evidence culled from the murder weapon (an unknown DNA profile that was not a match to Cy Greene's DNA profile), and that fingerprint evidence indicated that neither the plaintiff nor his co-defendant left a fingerprint found on the passenger partition of Guerrier's cab that one of the three passengers touched after Choi's murder (this latter fact was provided in the still undisclosed Guerrier interview).

**The KCDAO Foreclosed the Possibility of Further Relief in the Criminal Court**

242.    The KCDAO effectively denied any further review of its fraud/misconduct in the criminal court or federal court (through *habeas corpus* relief or otherwise) – by first, dismissing Mr. Greene's indictment (making his retrial, acquittal, and/or a renewed CPL 440 motion impossible), and then second, successfully opposing plaintiff's and Cy Greene's recent CPL 440 motions without disclosing the secreted evidence.

243.    The KCDAO claimed that Mr. Greene lacked "standing" to challenge the fraudulently-induced CPL 440 Order that vacated his conviction, once the fraudulently-concealed evidence became known to Mr. Greene, because his indictment was dismissed voluntarily by the KCDAO, and allegedly no criminal action remained to be effected. In other words, the KCDAO

argued that, by voluntarily dismissing the indictment, Mr. Greene was precluded from seeking any further review of law enforcement misconduct in the state court.

244.    On March 19, 2018, Justice Guy J. Mangano issued a Decision & Order denying Mr. Greene's new CPL 440 motion[16] that requested a voiding or modification of the 2006 CPL 440 Order and a finding of actual innocence and law enforcement fraud/misconduct based on the newly discovered evidence. Justice Mangano denied Mr. Greene's new CPL 440 application on procedural grounds without an evidentiary hearing ("because the case was dismissed, there is no longer a conviction before this Court to vacate"); Justice Mangano never reached the substantive merits of Mr. Greene's motion after determining that Mr. Greene lacked "standing" to revive his dismissed criminal action.[17]

245.    On plaintiff's CPL 440 motion filed in 2017, disregarding the sworn confession testimony and the newly-discovered evidence that now wholly corroborates the sworn confession testimony offered by plaintiff, Justice Mangano held that "[b]ecause defendant [plaintiff herein]

---

[16]    CPL§ 440.10 provides that the court in which judgment was entered may, upon defendant's motion, vacate such judgment upon various enumerated grounds, including:

[N]ew evidence has been discovered since the entry of judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at trial the verdict would have been more favorable to the defendant.

CPL 440.10 (1) (g). Generally, the information adduced at a CPL § 440.10 hearing is "not as complete as that which could be brought out at a trial under § 8-b, and no precedent has been cited that such would collaterally estop the unjust conviction action in the Court of Claims." *Turner v. State of New York*, 14 Misc.3d 699, 703 (Ct. Cl. 2006), *aff'd*, 50 A.D.3d 890 (2d Dep't 2008).

[17]    On May 21, 2018, Mr. Greene filed a motion seeking leave of the Appellate Division, Second Department, to appeal Justice Mangano's Order under the authority of C.P.L. §§ 450.15 and 460.10. This application was denied by a Decision & Order of Associate Justice Betsy Barrios on March 7, 2017 [sic: 2019], effectively ending any further, direct appellate review of the fraudulently-induced 2006 440 Order vacating Mr. Greene's conviction.

interposes only speculative and unsupported allegations of actual innocence, he has not met the burden that he is actually innocent."  Decision & Order dated March 19, 2018 at 4.

246.    Disregarding plaintiff's claims of newly-discovered evidence previously secreted by law enforcement, Justice Mangano held that "defendant Williams' claims of prosecutorial and police misconduct, defendant would have, and should have, raised the issues in his direct appeal, and the issues may not be raised in a motion to vacate the judgment."  *Id*.  This latter finding wholly disregarded Williams' undeniable proof that evidence had been secreted, which prevented him from previously raising it in a direct appeal of his conviction.

247.    Justice Mangano denied plaintiff any discovery from the police or KCDAO and refused to grant an evidentiary hearing despite Williams' presentation of newly discovered evidence.

248.    Plaintiff filed a motion for leave to appeal Justice Mangano's Decision & Order with the Appellate Division of the State of New York, Second Department, but he was rebuffed when that motion was denied by an Order of that court on March 19, 2019.

249.    Plaintiff thereafter filed a timely motion for leave to appeal with the New York Court of Appeals, but that motion was denied on August 20, 2019

250.    Plaintiff has now exhausted his attempts to prove law enforcement misconduct and obtain a court order compelling the protection of still-secreted exculpatory evidence and he is left with only the claims asserted herein.

**DNA Evidence of Actual Innocence**

251.    In addition to all the foregoing facts and circumstances (and such other supporting facts and circumstances as may be developed during discovery proceedings in this case) and plaintiff's related contentions, there is DNA evidence of Cy Greene's innocence and thereby, implicitly, plaintiff's actual innocence.

252.    During the course of the proceedings before Justice Pesce that led to the vacating of Cy Greene's conviction in 2006, Cy Greene applied for a DNA examination of the knife used in the stabbing, alleging that any DNA on the knife would not match his DNA profile.

253.    At the direction of Justice Pesce, a DNA test was conducted to discover whether there was any recoverable DNA evidence on the knife which was used to stab Choi.

254.    The examination of the knife was conducted by police laboratory technicians in the presence of an expert retained by counsel for plaintiff.

255.    The result of that test was that there was DNA recovered on the knife handle which did not match the DNA of Cy Greene.

256.    Plaintiff contends that this is compelling evidence of his actual innocence of the crime, as Cy Greene's innocence leads inexorably to a finding of his innocence under all the circumstances.

**Racial Discrimination and Class Animus**

257.    Upon information and belief, the defendants' and related persons' wrongful actions and omissions regarding the plaintiff were motivated and tainted by racial and class discrimination because of an improper attitude towards black persons, including the prejudicially selective disregard of their rights because of their race and class as if they were generally and individually more likely to be involved in criminal conduct than non-black persons.[18]

---

[18]    Lenny Best knew Norrito as a racist police officer:

Q.    Did Norrito, the detective I clarified as Norrito, ever use any racial epithets in your presence?
A.    Yes.
Q.    What?
A.    Called me a nigger. I have heard him call a few people niggers. Not only me, but a lot of us guys. But I also heard other officers do it too.  But, yes, I personally had him call me a nigger.

-46-

**Summary Statement of Legal Contentions**

258.  Under the circumstances described in this Complaint, the police and prosecution defendants and related persons accumulated substantial exculpatory evidence negating any basis for charging and prosecuting plaintiff with the crimes at issue yet they chose to disregard that evidence and, instead, to falsely and maliciously arrest, imprison and prosecute Larry Williams and then fraudulently concealed that exculpatory evidence to hide their misconduct and prevent plaintiff from proving his innocence.

259.  In wrongfully causing plaintiff to be arrested, charged, prosecuted, convicted and incarcerated for crimes that he did not commit, and then continuing his incarceration post-conviction through a continued fraud and secretion of evidence, the conduct of the individual defendant police officers, prosecutors and related persons included intentional, grossly negligent, deliberately indifferent, and/or negligent acts, which resulted in violations of plaintiff's constitutional, statutory, and/or common law rights.

<u>**LIABILITY OF INDIVIDUAL DEFENDANTS**</u>

260.  At all relevant times and at the time of all of their actions described in this Complaint, the individual defendants were acting under color of state law as agents, servants and employees of the City of New York and/or the Transit Authority and under the City and/or the Transit Authority supervision, direction and control.

---

L Best Depo. 44:14-23.  Lenny also remembered being present with Cy Greene when Norrito approached the two of them on the street.  According to Lenny, Norrito called Cy a "nigger" and then Cy flipped him "the bird."  Lenny's account of that incident is:

> It was either Norrito or his partner in the car and they told him [Greene], We're going to get your little ass, bastard; we're going to get you. They told Cy that.  That I remember. But I can't say it was this officer because there was two together, sometimes three in a car.  But I know when they rolled the car window down, I thought they were talking to me.  They ain't talking to me; they're talking to you.  The police said, Yeah, I am talking to you, scumbag, and he pointed at Cy.  I remember that definitely.

*Id*., 56:2-12.

261.    The individual defendants, in committing the conspiracies, acts and omissions to act and fraudulent concealment described above, were, in addition to all other allegations related above, deliberately indifferent to and in reckless disregard of all the plaintiff's rights, and said acts and omissions to act caused actual injury to plaintiff.

262.    The individual defendants, in committing the aforesaid acts, were concurrently acting as joint tortfeasors.

263.    At all times described above, the individual defendants were engaged in a joint venture, assisting each other in performing the various actions described and lending their support and the authority of their office to each other.

264.    As a direct and proximate result of the conspiracies, acts, and omissions to act, fraudulent concealment and evidence fabrication described above, the individual defendants subjected plaintiff to an unconstitutional arrest and false imprisonment; malicious prosecution; deprivation of federal and state constitutional, statutory and common law rights; emotional distress and mental anguish; physical injury and pain and suffering; interference with intimate relationships; embarrassment; humiliation; indignity; degradation; loss of employment opportunities and related income; and shame for being unlawfully arrested, charged, convicted, imprisoned, and maliciously prosecuted, and multiplied plaintiff's sentencing for subsequent convictions, all of these injuries arising out of his unjust conviction for the robbery of John Choi.

## LIABILITY OF DEFENDANTS CITY AND TRANSIT AUTHORITY

265.    Upon information and belief, all of the acts by the individual defendants and the related persons were carried out with full direct and/or constructive knowledge, consent, and cooperation and under the supervisory authority of defendant City and/or defendant Transit Authority.

266.   Upon information and belief, the City and Transit Authority defendants by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants and the related persons wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue; and/or engendered and fostered a climate to allow or encourage those acts to continue.

267.   Moreover, upon information and belief, the actions of the individual defendants and related persons resulted from and were taken pursuant to *de facto* policies and/or well-settled and widespread customs and practices of defendants City and/or Transit Authority, which were implemented by their police officers and the City Assistant District Attorneys, to intentionally and/or negligently circumvent the investigative process, to intentionally deceive and mislead defense attorneys and to knowingly obtain unjust convictions by covering-up, suppressing, concealing, altering, destroying, and/or failing to report on the existence of potentially exculpatory evidence.

268.   Upon information and belief, the existence of such *de facto* policies and/or well-settled and widespread customs and practices were known to supervisory and policy-making officers and officials of the New York City Police Department, the Transit Authority police force, the District Attorney Office, and the City for a substantial period of time prior to and long after June 14, 1983.

269.   Upon information and belief, despite knowledge of such illegal *de facto* policies, customs and practices, the supervisory and policy-making officers and officials of the Police Department, the Transit Authority police force, the District Attorney Office, and the City did not and have not taken adequate steps to terminate those policies and practices; did not and have not disciplined individuals who engage in such practices; did not and have not properly trained police officers and assistant district attorneys with regard to the constitutional and statutory limits on the

exercise of their authority, but have instead sanctioned, ratified, allowed and/or acquiesced in those unlawful policies, customs and practices through their deliberate indifference to or negligent disregard of the effect of those policies, customs and practices upon the constitutional rights of persons in the City of New York.

270.    Among the unlawful policies, customs and practices sanctioned, ratified, allowed and/or acquiesced in by defendants City and Transit Authority was a repeated and knowing failure to properly and adequately supervise, train and discipline police officers and other police personnel, including defendant officers and prosecutors, with respect to, among other matters, dealing with exculpatory evidence and conducting thorough and competent investigations, by repeatedly and knowingly failing to promulgate and enforce rules and regulations of the New York Police Department and the Transit Authority police force and KCDAO in a manner consistent with due process, and in compliance with the requirements of the constitutions and laws of the State of New York and the United States.

271.    Upon information and belief, these unlawful policies, customs and practices reflect the deliberate indifference of defendants City, Transit Authority and KCDAO to the constitutional rights of citizens of New York City as said defendants knew or should have known that the acts alleged herein would deprive such citizens, including plaintiff, of rights without due process of law, in violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article 1, §§ 1, 6, 11 and 12 of the New York State Constitution, as well as to federal and state common law and state statutes, including, without limitation, such rights as plaintiff rights, privileges and immunities to be free from false arrest; false imprisonment; malicious prosecution; cover-up, suppression and concealment of exculpatory evidence and conspiracy to cover up and suppress and conceal exculpatory evidence; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence in hiring, supervising, training, disciplining or

retaining police officers and detectives and other City and Transit Authority employees and agents, including assistant district attorneys, who were unfit for and lacking in competence for proper law enforcement purposes; and negligence in the training, instruction and disciplining of police officers, detectives, prosecutors and other City and former Transit Authority employees and agents, including assistant district attorneys.

272.    With respect to plaintiff's state law claims, defendants City and Transit Authority are also directly liable and responsible for the acts of defendants under the doctrine of *respondent superior*.

### LIABILITY OF SUPERVISORY PERSONNEL OF DEFENDANTS CITY AND TRANSIT AUTHORITY

273.    Upon information and belief, supervisory officers and personnel sanctioned, ratified, allowed and/or acquiesced in the individual defendants' affirmative acts and participated in the aforementioned unlawful policies, customs and practices.

274.    Without limiting the foregoing, the individual defendants' wrongful conduct includes an institutional history, upon information and belief, in numerous cases known to their supervisory personnel in which, prior to and/or after arrest and prosecution, police officers and other law enforcement personnel were aware of exculpatory evidence that was not known to or disclosed to the accused and their counsel.

275.    Despite such knowledge of the wrongful conduct of police officers and other law enforcement personnel under their supervision, supervisory personnel, upon information and belief, (a) frequently failed to take corrective action to remedy the adverse effect on persons charged with crimes of the failure to disclose exculpatory evidence to the accused and their counsel; (b) frequently compounded such wrongful failures to disclose by allowing false and fraudulent statements and representations on the part of persons under their supervision to remain uncorrected; (c) frequently failed to discipline, train and instruct police officers and district attorneys to remedy

such wrongful failures in order to fulfill their constitutional obligations and proper roles in the justice system; and (d) frequently tolerated rather than monitored and investigated such wrongful failures by police officers and assistant district attorneys.

276.    Further, in regard to the administrative and managerial functions of district attorneys and especially pertaining to obligations for disclosure to defense counsel in accordance with the standards of *Brady v. Maryland*, defendant City and supervisory personnel at the KCDAO evinced and followed a pattern of ignoring law enforcement improprieties and misconduct and a pattern of failure to train and supervise regarding disclosure obligations imposed by *Brady* and other legal obligations.

### FIRST CAUSE OF ACTION
### (Constitutional Violations - 42 U.S.C. § 1983)

277.    Plaintiff repeats, re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 276.

278.    Defendants, under color of state law, fabricated evidence and fraudulently concealed exculpatory evidence up to and through today,[19] and thereby subjected plaintiff to the foregoing conspiracies, acts and omissions to act without due process of law thereby depriving plaintiff of his rights, privileges and immunities secured by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights, privileges and immunities:

    a.   Plaintiff was deprived of his First Amendment right to "access to the courts."

---

[19]    Defendants Noritto, Tumbarello, Carter, and each of the individual prosecutor defendants unlawfully concealed (and continue to conceal unlawfully) the fact that Mark Best and Eduardo "Fulo" Furto were immunized informants and active participants in Choi's robbery/murder. Defendants Norrito, Tumbarello, ADAs Sullivan, Kallen, Greene and Mintz, and District Attorney Gonzalez unlawfully concealed (and continue to conceal unlawfully) the Reynold Guerrier interview audiotape and transcript and the notes and information collected during that interview. Defendants Norrito and Carter unlawfully concealed (and continue to conceal unlawfully) the identities of the three Panamanian passengers in Guerrier's cab who were undeniably chased from the crime scene to that cab. ADA Kallen fabricated the Guerrier interview transcript and withheld the audiotape.

b.   Plaintiff was deprived of his Fourth Amendment right to be free from malicious prosecution.

c.   Plaintiff was deprived of his Fourth Amendment right to be free from unreasonable searches and seizures of his person.

d.   Plaintiff was deprived of his Sixth Amendment right to confront the witnesses (informants) against him.

e.   Plaintiff was deprived of his Fourteenth Amendment right to liberty without due process of law.

f.   Plaintiff was deprived of his Fourteenth Amendment right to the equal protection of the laws.

g.   Plaintiff was deprived of his Fourteenth Amendment right to equal privileges and immunities of the laws.

**SECOND CAUSE OF ACTION**
**(Constitutional Violations - 42 U.S.C. § 1985(3))**

279.   Plaintiff repeats, re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 278.

280.   The defendants, acting under color of law and in violation of 42 U.S.C. § 1985(3), fraudulently concealed exculpatory evidence up to and through today and conspired to injure and damage plaintiff because of defendant's race and because of class-based animus against plaintiff.

281.   In furtherance of that conspiracy, the defendants fabricated evidence and subjected plaintiff to unlawful acts thereby depriving plaintiff of his rights to: confront witnesses against him under the Sixth Amendment, the equal protection of the laws and equal privileges and immunities under the laws in contradiction of the Fourteenth Amendment, and "access to courts" under the First Amendment, to the United States Constitution.

282.    The individual defendants committed the foregoing acts intentionally, willfully, and with malicious disregard for plaintiff's rights and are therefore also liable for punitive damages.

### THIRD CAUSE OF ACTION
### (Constitutional Violations - 42 U.S.C. § 1986)

283.    Plaintiff repeats, re-alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 282.

284.    The individual defendants, having knowledge of the conspiracy and of the wrongs about to be done to injure plaintiff and having the power to prevent or aid in preventing those wrongs, neglected and failed to do so in violation of 42 U.S.C. § 1986 and continued to fraudulently conceal exculpatory evidence up to and through today.

285.    By reason of their lack of reasonable diligence in preventing the wrongs to be done to injure plaintiff, defendants are liable for all damages resulting from those wrongful acts.

### FOURTH CAUSE OF ACTION
### (Violations of the New York State Constitution)

286.    Plaintiff repeats, re alleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 285.

287.    Defendants subjected plaintiff to the foregoing acts and omissions to act without due process of law, by fabricating evidence and fraudulently concealing exculpatory evidence up to and through today, and thereby deprived plaintiff of rights, privileges and immunities secured by Article 1, §§ 1, 6, 11, and 12 of the New York State Constitution, including, without limitation, the following deprivations of his rights, privileges and immunities:

a.    Plaintiff was deprived of the rights and privileges secured to him as a citizen of the State of New York, in violation of Article 1, § 1 of the Constitution of the State of New York;

b.    Plaintiff was deprived of his rights to liberty without due process of law, in violation of Article 1, § 6 of the Constitution of the State of New York;

c. Plaintiff was deprived of his right to equal protection of the laws, in violation of Article 1, § 11 of the Constitution of the State of New York;

d. Plaintiff was deprived of his right to be free from unreasonable searches and seizures of his person, in violation of Article 1, § 12 of the Constitution of the State of New York.

## FIFTH CAUSE OF ACTION
### (Malicious Prosecution)

288. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 287.

289. Defendants instituted and continued a criminal proceeding against plaintiff with malice and without probable cause up to and through his recent post-conviction motion and appeals in the state courts.

290. As a result, plaintiff suffered a deprivation of liberty, physical injury with pain and suffering, emotional distress and mental anguish, interference with intimate relationships, and other psychological injuries, including, without limitation, embarrassment, humiliation, indignity, degradation, shame, loss of employment opportunities and related income, and legal fees, costs and expenses.

291. The acts and conduct of the defendants constitute malicious prosecution under the laws of the State of New York, which was fraudulently concealed to further their wrongful purposes and hide their misconduct.

292. The individual defendants committed the aforesaid acts intentionally, willfully and with malicious disregard for plaintiff's rights and are therefore also liable for punitive damages.

## SIXTH CAUSE OF ACTION
### (Conspiracy & Fraud)

293. Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 292.

294.    Defendants conspired and fraudulently continued a criminal proceeding against plaintiff with malice and without probable cause by intentionally concealing exculpatory evidence and then continued to conceal exculpatory evidence beyond plaintiff's conviction to hide the defendants' misconduct and prevent plaintiff from proving his actual innocence.

295.    As a result, plaintiff suffered a deprivation of liberty, physical injury with pain and suffering, emotional distress and mental anguish, interference with intimate relationships, and other psychological injuries, including, without limitation, embarrassment, humiliation, indignity, degradation, shame, loss of employment opportunities and related income, and legal fees, costs and expenses.

296.    The acts and conduct of the defendants constitute conspiracy and fraud under the laws of the State of New York, which was employed to fraudulently conceal misconduct and exculpatory evidence.

297.    The individual defendants committed the aforesaid acts intentionally, fraudulently, willfully and with malicious disregard for plaintiff's rights and are therefore also liable for punitive damages.

### SEVENTH CAUSE OF ACTION
### (Negligence of Individual Defendants)

298.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 297.

299.    Defendants, by their aforesaid acts, negligently failed to use due care in the performance of their duties.

300.    All of defendants' acts were performed without any negligence on the part of plaintiff and were the proximate cause of plaintiff's injuries.

**EIGHTH CAUSE OF ACTION**
**(Negligence of Defendant City and Transit Authority)**

301.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 300.

302.    Defendants City of New York and Transit Authority, by their aforesaid acts, negligently failed to use due care in the performance of their duties.

303.    Said defendants' acts were performed without any negligence on the part of plaintiff and were the proximate cause of plaintiff injuries.

**NINTH CAUSE OF ACTION**
**(Negligent and/or Intentional Infliction of Emotional Distress)**

304.    Plaintiff repeats, realleges and incorporates by reference each and every allegation set forth in paragraphs 1 through 303.

305.    Defendants owed a duty of care to act ethically and within the rules of law, as police officers or quasi-judicial officers, to ensure a fair investigation, a fair trial and proper post-conviction proceedings free from misrepresentation.

306.    Defendants failed to conduct themselves in that manner by knowingly, recklessly or negligently withholding and ignoring exculpatory evidence when they had an absolute duty to produce it and bring it promptly to the attention of the court and defense counsel.

307.    Various personnel within the KCDAO and the NYPD (including all of the defendants named herein) improperly argued against vacating plaintiff's conviction in the face of mounting evidence of his innocence by, among other things, fabricating evidence and concealing evidence of his innocence.  By doing so, they placed their credibility and status as District Attorneys, scientists, Assistant District Attorneys and NYPD police officers before the court in a single-minded attempt to uphold a conviction at all cost, without regard to the truth.

308.    Through its personnel, the KCDAO and the NYPD (including all of the defendants named herein) failed to investigate further and properly when confronted with clear-cut evidence

pointing toward the innocence of plaintiff and they thereafter intentionally, recklessly or negligently lost, fabricated, secreted or misplaced exculpatory evidence.

309.    Defendants did these outrageous, unethical and improper acts in a case fraught with ambiguity and, at a minimum, substantial doubt about the guilt of plaintiff, thereby subjecting an innocent person to years of imprisonment and shame without any regard as to his innocence and the suffering that a conviction would create; these defendants continued to fight to uphold plaintiff's conviction despite evidence in their possession - withheld from the defense - which clearly indicated his innocence.

310.    Each of the defendants is, therefore, liable personally and in their official capacity for these acts which damaged plaintiff.

311.    The defendant City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

312.    As a direct and proximate result of the above-described outrageous conduct by one or more of the aforementioned defendants, plaintiff was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment for many years.   During all of these events, plaintiff endured substantial physical, emotional and pecuniary injuries.

**TENTH CAUSE OF ACTION**
**AGAINST THE DEFENDANTS**
**FOR FALSE ARREST/ FALSE IMPRISONMENT**

313.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Complaint in paragraphs 1 through 312, inclusive, with the same force and effect as if set forth at length herein.

314.    The defendants arrested and/or confined plaintiff intentionally and without the right to do so.

315.    The defendants did not have probable cause for believing that a crime had been committed and/or that plaintiff had committed it.

316.    The defendants did not act as reasonably prudent persons in effecting the arrest and confinement of plaintiff.

317.    Following the wrongful arrest and wrongful initial confinement of plaintiff, the defendants continued the unlawful detention and confinement of plaintiff without probable cause by intentionally secreting, recklessly misplacing, and/or negligently losing exculpatory material (documents and information).

318.    Plaintiff did not consent to the arrest and confinement by the defendants.

319.    Each of the defendants is liable personally and in their official capacity for these acts which damaged plaintiff.

320.    Defendant The City is liable for the wrongful acts and omissions of its servants, agents and/or representatives under the doctrine of *respondeat superior*.

321.    As a direct and proximate result of the false arrest and false imprisonment by one or more of the defendants, plaintiff was forced to endure a wrongful arrest, an unfair trial, a wrongful conviction and a wrongful imprisonment.  During all of these events, plaintiff endured substantial physical, emotional and pecuniary injuries.

322.    Accordingly, plaintiff now demands judgment against the defendants for compensatory damages, punitive damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**AGAINST THE CITY FOR ITS POLICY MAKERS'**
**WRONGFUL VIOLATION OF PLAINTIFF'S CIVIL**
**RIGHTS UNDER COLOR OF STATE LAW (MUNICIPAL LIABILITY)**

323.    Plaintiff repeats, reiterates, and realleges each and every allegation set forth in this Amended Complaint in paragraphs 1 through 322, inclusive, with the same force and effect as if set forth at length herein.

324.    Municipalities and their subdivisions may be held liable to an individual if they enforce a policy or custom that causes the deprivation of the individual's constitutional rights.

325.    Municipal liability may be based upon:

   a.    a formally promulgated policy;

   b.    a well settled custom or practice;

   c.    a final decision by a municipal policymaker; or

   d.    deliberately indifferent training or supervision.

326.    Defendant The City, by and through its final policymakers, maintained the following unconstitutional customs, decisions, policies, and/or indifferent employee training or supervision practices that allowed for various constitutional violations:

   a.    NYPD personnel systematically failed to disclose to prosecutors material information that was favorable to criminal defendants;

   b.    NYPD and KCDAO personnel systematically fabricated falsely inculpatory evidence and/or committed perjury against suspects in order to secure arrests and close cases;

   c.    NYPD and KCDAO personnel systematically abused process by presenting false evidence to courts reviewing investigations, arrests and detention of suspects;

d. NYPD and KCDAO personnel systematically destroyed, lost or secreted evidence, or recklessly disregarded the rights of the accused in timely producing evidence, to further their personal goals of obtaining and sustaining convictions; and

e. NYPD and KCDAO personnel acted with impunity in destroying criminal evidence, or by reporting it "lost" claiming that they had no duty to perform a post-conviction investigation and produce evidence once a conviction had been obtained.

327. The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices were: (a) deliberately or recklessly indifferent to the obvious risks of inducing eyewitnesses to crimes to misidentify suspects, (b) deliberately or recklessly indifferent to the repeated secretion, destruction and/or loss of material criminal evidence, (c) deliberately or recklessly indifferent to a criminal defendant's constitutional rights, and (d) deliberately or recklessly indifferent to the issue of whether innocent people were being convicted of crimes.

328. The press has been following the City's reckless indifference to its own law enforcement's misconduct for many, many years. *See, e.g.*, R. D. O'Brien, *60 Criminal Cases Are Thrown Out Because of 3 Detectives' Misconduct,* NY Times, No. 8, 2021, https://www.nytimes.com/2021/11/08/nyregion/nypd-queens-detectives.html?action=click&module=Well&pgtype=Homepage&section=New%20York ; J. Bromwich, *They Publicized Prosecutors' Misconduct. The Blowback Was Swift, NY Times, Nov. 10, 2021,* *https://www.nytimes.com/2021/11/10/nyregion/queens-prosecutors-misconduct.html?action=click&module=Well&pgtype=Homepage&section=New%20York.*

329. The City's municipality liability here is premised upon, among other things, its failure to adopt proper and reasonable policies and practices in the face of an obvious need to do so.

330.    The aforesaid conduct operated, *inter alia*, to deprive plaintiff of important and well established rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and rights established by the Constitution of the State of New York, including plaintiff's right not be significantly detained pretrial except pursuant to a fair and reliable determination of probable cause, his right to be free from a bad-faith prosecution, his right to a fair trial, his right to confront his accusers, his right to freedom from the deprivation of liberty without due process of law, and his right to be free from cruel and unusual punishment.  Such misconduct also directly and proximately caused his arrest, his indictment, his conviction, his sentence and his unjust incarceration.

331.    As a direct and proximate result of The City's unconstitutional customs, decisions, policies and/or indifferent employee training or supervision practices, plaintiff was falsely imprisoned, maliciously prosecuted, forced to endure an unfair trial and wrongful conviction and then wrongfully imprisoned.  During all of these events, plaintiff endured substantial physical, emotional and pecuniary injuries detailed above.

332.    Thus, pursuant to 42 U.S.C. § 1983, plaintiff now demands judgment against Defendant The City for compensatory damages, plus attorney fees, costs, expenses, and any other and further relief this Court deems just and proper..

WHEREFORE, Plaintiff Larry Williams demands the following relief against the defendants, jointly and severally:

a.    Compensatory damages in an amount to be determined at trial, but not less than $25,000,000.00;

b.    Punitive damages from the individual defendants in the amount of $25,000,000.00; and

c.      Such other and further relief as this Court may deem just and proper, including

reasonable attorney fees and costs and such attorney fees and costs as may be

provided pursuant to 42 U.S.C. § 1988.

\* \* \* \* \* \* \*

A jury trial is demanded.

Dated:      New York, New York
            November 24, 2021

                              By:      _John F. Schutty_
                                       John F. Schutty
                                       Law Office of John F. Schutty
                                       *Attorney for Plaintiff*
                                       445 Park Avenue. 9th Floor
                                       New York, NY 10022
                                       Tel: (212) 745-1145
                                       Fax: (917) 591-5980
                                       john@johnschutty.com

-63-

## **VERIFICATION**

STATE OF NEW YORK    )

                        ) ss.

COUNTY OF NEW YORK  )

        LARRY WILLIAMS, being duly sworn, deposes and says:

Deponent is the plaintiff in the within action. Deponent has read the foregoing Verified Complaint and Jury Demand and knows the contents thereof; the same is true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

                                          Larry Williams

Sworn to before me this
24th day of November, 2021.

Notary Public

JOHN F. SCHUTTY
NOTARY PUBLIC, State of New York
No. 02SC6080520
Qualified in New York County
Commission Expires March 17, 20 23