UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

LARRY WILLIAMS,                                           :
                                                         :
                                     Plaintiff,           :
                                                         :          MEMORANDUM & ORDER
                    -against-                             :
                                                         :          21-CV-3005 (ENV) (RML)
THE CITY OF NEW YORK; NEW YORK CITY                      :
TRANSIT AUTHORITY; DETECTIVES OR                         :
FORMER DETECTIVES MICHAEL NORRITO                        :
(Shield No. 3736), JOSEPH TUMBARELLO                     :
(Shield No. 883) and ROBERTO CARTER, in their            :
individual and official capacities; FORMER               :
ASSISTANT DISTRICT ATTORNEYS, ROBERT                     :
SULLIVAN, in his individual and official                 :
capacities, DOUGLAS KALLEN, in his individual            :
and official capacities; GERALD GREENE, in his           :
individual and official capacities; PHYLLIS              :
MINTZ, in her individual and official capacities;        :
ERIC GONZALEZ, DISTRICT ATTORNEY,                        :
KINGS COUNTY, in his individual and official             :
capacities; and JOHN DOES 1, 2, 3, etc., and JANE        :
DOES 1, 2, 3, etc. (whose identities are unknown         :
but who are or formerly were Police Officers and/or      :
supervisory personnel of the New York City Police        :
Department and/or Transit Authority Police               :
Department), all being sued in their individual and      :
official capacities,                                     :
                                                         :
                                     Defendants.          :

------------------------------------------------------------- x

VITALIANO, D.J.

On May 27, 2021, plaintiff Larry Williams commenced this civil action against defendants

the City of New York (the "City"); the New York City Transit Authority (the "Transit Authority");

former New York City Police Department ("NYPD") Detectives Michael Norrito and Roberto

Carter; former New York City Transit Police Department Detective Joseph Tumbarello; former

Kings County Assistant District Attorneys Robert Sullivan, Douglas Kallen, Gerald Greene, and

Phyllis Mintz; current Kings County District Attorney Eric Gonzalez; and an indeterminate

1

number of John and Jane Does (collectively, "defendants").  Compl., Dkt. 1, at 1–5.[1]  In the

operative complaint, plaintiff brings a bevy of claims, principally under 42 U.S.C. § 1983, alleging

that defendants violated his civil rights by participating in a decades-long conspiracy to frame him

as a participant in a 1983 robbery-homicide, suppress exonerating evidence, and thwart his 2017

attempt to obtain state post-conviction relief.  Am. Compl., Dkt. 26, at 52–63.  Defendants move

to dismiss the operative complaint under Rule 12(b)(6).  Defs.' Mot., Dkt. 39, at 12; Defs.' Reply,

Dkt. 42, at 31.[2]  For the reasons that follow, defendants' motion to dismiss is granted.

<u>Background</u>[3]

On June 14, 1983, John Choi and his friend, Jae Hark Kim, entered the Church Avenue

subway station in Flatbush, Brooklyn, looking to hop a train to Manhattan.  Am. Compl. ¶¶ 28–

30.  As Choi and Kim descended the stairs, five young men chased them, caught up to Choi, and

robbed him.  *Id.* ¶¶ 32–34.  While one assailant blocked Kim from coming to Choi's aid, another

assailant plunged a knife into Choi's chest.  *Id.* ¶¶ 33–34.  The five assailants bolted from the

subway station, and Kim carried his mortally wounded friend up to the street and into a nearby

---

[1] All citations refer to the Electronic Case Filing System ("ECF") pagination.

[2] Defendants' motion was filed without reference to Detective Roberto Carter.  On the strength of
the findings made on the motion, the Court dismisses plaintiff's claims against Detective Carter
*sua sponte*.  "Although the other defendants have not explicitly moved to dismiss the complaint
for failure to state a claim, the Court has discretion to dismiss claims *sua sponte* pursuant to Rule
12(b)(6), particularly where it is clear that a plaintiff could not have prevailed on the facts as
alleged in the complaint."  *Citadel Mgmt., Inc. v. Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 146
(S.D.N.Y. 2000).  At any rate, Detective Carter is dismissed from this action "because the issues
addressed [on the motion] apply equally well to [all] defendants."  *Johnson v. Scanlon*, No. 91-
CV-1807 (CPS), 1992 WL 398312, at *1 n.1 (E.D.N.Y. Dec. 21, 1992), *aff'd*, 996 F.2d 302 (2d
Cir. 1993); *see also Arac v. People*, No. 97-CV-1506 (JSR), 1999 WL 813418, at *1 n.3 (S.D.N.Y.
Oct. 12, 1999), *aff'd sub nom. Arac v. Bodek*, 213 F.3d 625 (2d Cir. 2000).

[3] The facts are drawn from the operative complaint and taken as true, with all reasonable inferences
drawn in plaintiffs' favor, as they must be on a motion to dismiss.  *Vietnam Ass'n for Victims of
Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

store.  *Id.* ¶¶ 35–36.  The next day, Choi succumbed to his wounds, and died at Kings County Hospital, where he had been transported.  *Id.* ¶¶ 42–43.

The investigation began almost immediately.  Kim gave a statement to one of the first responding officers just after Choi was taken to the hospital, describing the stabber as a six-foot-tall black man.  *Id.* ¶ 47.  In subsequent interviews with law enforcement, Kim gave varying height descriptions, saying that the stabber was between five-foot-eight and five-foot-nine inches tall, and adding that the stabber was wearing a dark brown shirt.  *Id.* ¶¶ 50–55.  During one of these interviews, plaintiff alleges, Kim told an unspecified officer that he could "possibly" identify Choi's stabber.  *Id.* ¶ 184 n.2.  Recording this statement, the unknown officer marked on a "Homicide Worksheet" that Kim could "possibly" identify the stabber.  *Id.* ¶ 58.

Within hours of the attack, Detective Michael Norrito and Detective Joseph Tumbarello were assigned to lead the investigation into Choi's homicide and ADA Robert Sullivan was the first prosecutor assigned to the case.  *Id.* ¶¶ 62–63.  On the night of June 14, plaintiff alleges that Detective Norrito, Detective Tumbarello, and ADA Sullivan interviewed Kim at the 67th precinct.  *Id.* ¶¶ 68–69.  During that interview, which plaintiff claims was taped, Kim did not estimate the stabber's height in feet and inches; instead, he said that the stabber was a "tall guy" wearing a brown shirt.  *Id.* ¶¶ 70–71.

Detective Norrito and Detective Tumbarello also interviewed Eric Head that same night.  *Id.* ¶ 87.  Head had been working in a store near the Church Avenue subway stop and had observed three men flee the subway stop at 4:35 pm, and said he recognized the three men as "pick pockets" who frequented the Church Avenue subway stop.  *Id.* ¶¶ 87–91.  Head identified one of the fleeing men as Lenny Best.  *Id.* ¶ 93.

At least four other witnesses in the vicinity of the Church Avenue subway stop saw men

running from the station at the time of Choi's stabbing. *See id.* ¶¶ 82–84. All of these witnesses described the fleeing men as at least over five-foot-three inches tall. *See id.* ¶¶ 82–116. All were interviewed by police officers from the 67th precinct. *See id.* And notably, all of these interviews appear to have been turned over to plaintiff prior to trial. *See id.* One witness, Abdul Rahman, saw three men, all five-foot-eight inches tall, running from the station. *Id.* ¶ 83. One of the fleeing men was wearing a brown shirt. *Id.* Another witness, James Robinson, chased after one of the fleeing men, who he described as a six-foot-tall black man with a brown shirt. *Id.* ¶¶ 104–06. Robinson chased the man for a few blocks until he entered a cab in which "two other men were already sitting." *Id.* ¶ 108.

Earlier on June 14, a detective spoke with the man plaintiff alleges was the driver of that taxi, Reynold Guerrier, at his home. *Id.* ¶¶ 118–20. Guerrier told the detective that, near the time of Choi's stabbing, he was sitting in his parked taxi near Veronica Place. *Id.* ¶¶ 120–21. Suddenly, three young black men, out of breath and ranging in height from five-foot-five to five-foot-seven inches tall, jumped into the back of his cab and asked for a ride to Flatbush Avenue. *Id.* ¶¶ 116, 120–28. That detective memorialized Guerrier's interview in an official police report. *Id.* ¶ 128. Without providing any factual basis for his assertion, Williams charged in the operative complaint that "[v]ery significant information provided by Guerrier to law enforcement" was omitted from this report. *Id.* ¶ 129. Flashing forward, Williams charges in his complaint that these detectives and the prosecutor then interviewed Guerrier at the 67th precinct after the interview at his home. *Id.* ¶¶ 117–18. During their allegedly tape-recorded interview, plaintiff claims that Guerrier said that the men who entered his cab spoke Spanish. *Id.* ¶¶ 189 n.4, 191, 239 n.15.

At some point after interviewing Guerrier, Detective Norrito spoke with Detective Carter, a colleague at the 67th precinct, though he was not assigned to the Choi investigation. *See id.*

4

¶¶ 208–09.  During this conversation, plaintiff claims that Detective Carter told Detective Norrito that one of his "confidential informant[s]" had fled into Guerrier's cab.  *Id.* ¶ 208.  From this, plaintiff surmises that this informant, who plaintiff alleges was Eduardo Furto, "must have conveyed to Officer Carter that he . . . was involved in the crime."  *Id.* ¶ 209.  Indeed, to plaintiff, there is "[n]o other plausible explanation" as to why Detective Carter told Detective Norrito about Furto.  *Id.*  Seemingly acting on this tip, Detective Norrito then located and interviewed two of the men who fled to Guerrier's taxi, though he did not prepare a report memorializing his interview. *Id.* ¶ 193; *see also id.* ¶¶ 218, 231–32.  Without articulating how or why he came to this conclusion, plaintiff believes that Furto was such an important informant for the NYPD that, although he was one of Choi's assailants, Detective Norrito gave him "an implicit deal/immunity."  *See id.* ¶ 241.

On June 15, 1983, based on their interview with Head, "Detectives Norrito and/or Tumbarello" took Lenny Best into custody for questioning.  *Id.* ¶ 96.  However, as Best was driven to the precinct, he somehow escaped.  *Id.* ¶ 97.  He was not subsequently apprehended or questioned.  *Id.*  Although plaintiff alleges that, at that time, Detective Norrito and Detective Tumbarello considered Lenny Best to be a prime suspect for Choi's murder, they violated NYPD policy by failing to write an "Unusual Occurrence report[]" memorializing his escape from custody. *Id.* ¶¶ 99–102.

The following day, at the 67th precinct, Detectives Norrito and Tumbarello and ADA Sullivan interviewed Mark Best, Lenny Best's brother.  *Id.* ¶¶ 94, 135.  Plaintiff also asserts that Mark Best was one of Choi's assailants and had been working as an "NYPD informant."  *Id.* ¶¶ 93, 188, 198.  During the interview, Detective Norrito, Detective Tumbarello, and ADA Sullivan "subjected [Mark Best] to improper police pressure and coercion" and offered him a job at a laundromat if he agreed to falsely accuse Greene and plaintiff.  *Id.* ¶¶ 137, 199 n.8.  After agreeing

to this deal, Mark Best told Detective Norrito and Detective Tumbarello that he was at the Church Avenue station on June 14, had seen three men attack and rob Choi, and recognized and could identify the stabber.  *Id.* ¶¶ 138–39.  Mark Best identified the stabber as Cy Greene and gave the police his address, and looked at photographs of Greene.  *Id.* ¶ 140.

Five days later, Detective Norrito and other officers raided Greene's apartment.  *Id.* ¶ 142.  In the apartment, they found Greene and plaintiff, arresting both men.  *Id.* ¶¶ 142–43.  Plaintiff alleges that he was arrested "simply because he was with Cy Greene at the time of the latter's arrest."  *Id.* ¶ 143.  Later that day, after being transported to the 67th precinct, plaintiff was interrogated by the police and prosecution.  *Id.* ¶ 144–45.  Plaintiff told the officers he was innocent, and both he and Greene offered "independent alibis supported by third-parties."  *Id.* ¶ 145.  Following the interrogation, while he and Greene were in a holding cell, waiting to be placed in lineups, plaintiff observed "an Asian man" approach their cell and stare at them.  *Id.* ¶ 148.  They did not recognize the man.  *Id.*  When they asked a janitor who the man was, he purportedly said that "the man was there to identify the men who murdered his friend."  *Id.*  Once plaintiff and Greene were placed in lineups, Mark Best and Kim identified them as Choi's assailants, pegging Greene as the stabber, even though he was only five-foot-one inches tall.  *Id.* ¶¶ 60, 149.

On June 24, 1983, a Kings County grand jury handed up an indictment charging both Greene and plaintiff with second-degree murder and first-degree robbery, with Greene the accused stabber.  *Id.* ¶ 154.  Prior to trial, ADA Kallen was assigned to the case, until, at some point, he was replaced as trial counsel by ADA Greene.  *See id.* ¶ 205.  To secure Mark Best's cooperation, ADA Kallen made an "explicit deal," recorded the deal in his handwritten trial notes, and never told plaintiff about the deal before he left the case.  *Id.* ¶¶ 198 n.7, 204–05.  Once he took over,

ADA Greene failed to reveal to Williams that the People had made a deal with Best to enlist his cooperation. *Id.* ¶ 205. In fact, plaintiff alleges that ADA Greene twice affirmed that he had turned over all impeachment material related to Mark Best without revealing that Detective Norrito or ADA Kallen had offered Mark Best a deal. *Id.* ¶ 198 n.6.

This episode of obfuscation if not deceit, plaintiff contends, was part of a larger misconduct scheme. For example, Williams claims that though these detectives and the prosecutors knew about the Furto "deal," they did not disclose it. *Id.* ¶ 278 n.19. Along with Detective Norrito, Detective Tumbarello, and ADA Sullivan, plaintiff alleges that ADA Kallen and Greene omitted Kim's "tall guy" statement from the transcript of his June 16 interview before turning the transcript over to plaintiff. *Id.* ¶¶ 72–73, 77. Likewise, though Detective Norrito, Detective Tumbarello, and ADA Sullivan turned over the transcript and audiotape of their interview with Guerrier to ADA Kallen and ADA Greene, neither ADA Kallen nor ADA Greene turned the transcript over to plaintiff. *Id.* ¶ 223. Furthermore, though he does not chalk these failures up to ADA Kallen and Greene, plaintiff alleges that he did not receive notice prior to trial that Kim said he could "possibly" identify Choi's stabber, that Lenny Best had escaped from custody, or that Detective Norrito had interviewed some of the men who fled to Guerrier's cab. *Id.* ¶¶ 58, 96–103, 184 n.2, 193, 218, 231–38.

At a pre-trial suppression hearing in December 1984, plaintiff argued that his lineup identification was tainted because Kim was permitted to view him in his holding cell before the lineup. *Id.* ¶ 155. According to plaintiff, the police and prosecution had Kim peer at Greene and plaintiff to ensure that he would pin them as Choi's assailants during the lineup. *See id.* ¶ 150. The motion to suppress was denied. *Id.*

In the spring of 1985, plaintiff and Greene were tried jointly. *Id.* ¶ 156. At trial, Detective

7

Norrito and Detective Tumbarello testified that Mark Best had identified plaintiff and Greene during the lineup.  *Id.* ¶ 158.  On cross-examination, Detective Norrito denied having interviewed Guerrier and said that "the cab had nothing to do with [the] case at all."  *Id.* ¶¶ 211, 217.  Mark Best did not testify, and the prosecution claimed that they could not locate him.  *Id.* ¶ 160.  Nevertheless, plaintiff states that Mark Best's "hearsay account of the crime was improperly conveyed to the jury, over defense counsel's objections."  *Id.* ¶ 200 n.9.

   More problematic for the accused assailants, the lineup identification made by the absent Mark Best was corroborated by the very testimony of Kim, who was Choi's travel companion when Choi was murdered in the Church Avenue subway station and identified Greene as the stabber and plaintiff as an assailant.  *Id.* ¶ 159.  At trial, it came out that Kim had initially said the robber was six feet tall, and had later revised his estimate to five-foot-nine inches.  *Id.* ¶ 162.  The stabber's height became a highly disputed issue at trial, plaintiff alleges, because though Kim had given multiple height estimates for the stabber that indicated the stabber was taller than him, Greene was in fact shorter than Kim.  *See id.* ¶¶ 50–61.  To allay these concerns, plaintiff avers that prosecutors argued that Kim's height estimates, made in feet and inches, were inaccurate because, having been born and raised in Korea, Kim was more comfortable estimating height in meters and centimeters.  *Id.* ¶¶ 75–76.  As a result, plaintiff contends, the prosecution was able to paper over Kim's inconsistent height estimates and their incongruity with Greene's height.  *See id.* However, if he had access to Kim's "tall guy" statement, plaintiff contends that he could have effectively impeached Kim and undermined the prosecution's argument.  *See id.*

   Plaintiff was convicted of first-degree robbery for acting as an accomplice, while Greene was convicted of felony murder and second-degree robbery as the stabber.  *Id.* ¶ 167.  As a result of his conviction, plaintiff was incarcerated until May 1988, when he was released on parole.  *Id.*

¶ 175.  At the latest, plaintiff's parole (and all restrictions on his liberty related to the above) expired in May 1994.[4]  Interestingly, during the period from the time of his conviction to the time his parole expired, the operative complaint does not allege that Williams filed a direct appeal, a petition for state post-conviction relief under New York Criminal Procedure Law ("CPL") § 440, or a federal petition for a writ of habeas corpus.

In the early 1990s, according to Williams, Greene filed a § 440 petition.[5]  *See id.* ¶ 201.  In support of that petition, Greene submitted affidavits prepared by Mark Best in February 1991 and April 1992.  *Id.* ¶ 199 n.8.  In those affidavits, Mark Best suggested that he was one of Choi's assailants and claimed that he had falsely implicated Greene and plaintiff because Detective Norrito had both threatened him and helped him land a job in a laundromat.  *Id.*  In response to these affidavits, the trial court ordered the Kings County District Attorney's Office to investigate Mark Best's allegations.  *Id.* ¶ 201.  In any case, despite this alleged order, plaintiff claims that the Kings County District Attorney's Office did not conduct an investigation and continued to

---

[4] The operative complaint does not specify when plaintiff's parole expired.  At this stage, the Court is bound to draw inferences from the factual allegations in the complaint in the light most favorable to the plaintiff, and to construe the complaint liberally.  *See Xeriant, Inc. v. Auctus Fund LLC*, 141 F.4th 405, 411 (2d Cir. 2025).  Because the statute of limitations started running on plaintiff's § 1983 claims when he became ineligible for habeas relief, *see infra* Section I, and because he became ineligible for habeas relief upon the expiration of his parole, viewing the complaint in the most favorable light requires the Court to assume that plaintiff's parole expired on the latest date possible, thus giving him the maximum period in which to sue.  That date is May 1994.  Plaintiff was convicted of first-degree robbery and received an indeterminate sentence with a minimum of four years and six months and a maximum of nine years.  *See* Am. Compl. ¶ 173.  A parolee in New York "shall be under the supervision of the department of corrections and community supervision for a period equal to the unserved portion of his or her maximum or aggregate maximum term unless discharged in accordance with law."  N.Y. Penal Law § 70.40 (McKinney).  Because plaintiff does not allege his sentence was discharged, the latest date that his parole for his May 1985 conviction could have expired was nine years from that date, or May 1994.

[5] Plaintiff does not specify when Greene filed this § 440 petition, though he includes allegations which indicate the petition was being litigated in 1992.  *See* Am. Compl. ¶ 201.

suppress ADA Kallen's trial notes.  *Id.* ¶ 202.  Plaintiff does not indicate when or why the trial court denied this § 440 petition.  *See id.* ¶ 177.

Greene launched another § 440 petition in December 2003.  *Id.*  Greene challenged his convictions on multiple grounds, including that he was actually innocent, law enforcement misconduct tainted his convictions, and his trial counsel provided ineffective assistance.  *Id.* ¶ 185. In support of his post-conviction petition, Greene had Lenny Best testify, who claimed that his brother, Mark Best, and one of his brother's friends admitted that they had robbed Choi along with a few "Panamanians," one of whom had stabbed Choi.  *Id.* ¶ 188.  Another witness, Ruperto Lindsay, who is Panamanian, testified that he saw two men he recognized fleeing the Church Avenue subway station, one of whom allegedly later confessed that he was Choi's stabber.  *Id.* ¶ 189.  Greene, however, did not present evidence from the Guerrier interview or argue that it had been unconstitutionally suppressed.  *See id.* ¶ 224 n.12.  As plaintiff tells it, this is because the ADA litigating the § 440 petition, ADA Mintz, had decided to withhold the Guerrier interview transcript from him.  *Id.*

In January 2006, Supreme Court, Kings County vacated Greene's convictions on ineffective assistance of counsel grounds but denied relief on actual innocence and law enforcement misconduct grounds.  *Id.* ¶¶ 177, 194.  In June 2008, the Kings County District Attorney's Office agreed to drop the charges against Greene.  *Id.* ¶ 182.  Though seemingly a cause for celebration on Greene's part, plaintiff contends that the Kings County District Attorney's Office dropped Greene's charges with nefarious intent—to stymie Greene's efforts to prove his innocence and uncover law enforcement misconduct.  *Id.* ¶¶ 242–43.  Notably, plaintiff claims that he was unaware of the "specific evidence" Greene adduced in his post-conviction proceedings, but does not allege he was unaware of Greene's post-conviction litigation or the claims he brought.

*See id.* ¶ 186.

In 2008, Greene filed a § 1983 suit against the City, the Transit Authority, Detective Norrito, Detective Tumbarello, the then-Kings County District Attorney, and ADA Sullivan. *See Greene v. City of New York*, No. 08-CV-243 (AMD) (CLP), 2017 WL 1030707, at *1 (E.D.N.Y. Mar. 15, 2017), *aff'd*, 742 F. App'x 532 (2d Cir. 2018). Through discovery, Greene obtained ADA Kallen's trial notes. Am. Compl. ¶ 203. Better yet, according to plaintiff, Greene deposed ADA Kallen, and got him to admit that there was a "deal" with Mark Best and that he had intended to disclose its existence, but had not done so, and his successor, ADA Greene, had denied the deal's existence. *Id.* ¶¶ 204–05. Other documents turned over to Greene indicated that law enforcement referred to Mark Best as a "[c]o-[d]efendant." *Id.* ¶ 206.

Greene also deposed Detective Norrito. *Id.* ¶ 208. During his deposition, Detective Norrito testified that he had learned from Detective Carter, a colleague at the 67th precinct, that there was a "confidential informant" named Eduardo Furto in Guerrier's cab. *Id.* ¶¶ 208–09. Detective Norrito also admitted that he had interviewed two of the men in Guerrier's cab, both of whom were "Panamanian," though he did not divulge the names of the men he interviewed. *Id.* ¶¶ 234, 238. The operative complaint implies that at some point, Detective Norrito said he had told prosecutors the names of the men he interviewed. *See id.* ¶ 239 ("The City and the KCDAO have continued to secrete [sic] . . . the identities and nationalities of the men in Guerrier's cab."). Nevertheless, in 2017, Judge Donnelly dismissed Greene's complaint in its entirety following a motion for summary judgment. *See Greene*, 2017 WL 1030707, at *32.

Also in 2017, plaintiff filed his own § 440 petition, seeking to vacate his 1985 conviction. Am. Compl. ¶ 195. Like Greene, plaintiff claimed that he was actually innocent, the victim of law enforcement misconduct, and afforded constitutionally ineffective assistance of counsel. *Id.*

11

Plaintiff, however, does not allege what evidence he used to advance his claims or even which law enforcement officials he accused of engaging in misconduct.  At around this time, though he fails to articulate a clear chronology, plaintiff claims that both he and Greene "appealed to [DA Gonzalez]" and asked him to turn over the Guerrier transcript.  *Id.* ¶ 224 n.12.  Plaintiff's § 440 petition was summarily denied by Supreme Court, Kings County and affirmed by the Appellate Division, Second Department.  *Id.* ¶¶ 244–48.  The New York Court of Appeals denied plaintiff leave to appeal in 2019.  *Id.* ¶ 249.

Plaintiff further asserts that he was prosecuted because law enforcement harbored racial animus "towards black persons."  *Id.* ¶ 257.  Specifically, plaintiff cites deposition testimony of Lenny Best, presumably taken during Greene's § 1983 suit, where Lenny Best recounted instances of Detective Norrito calling him and Greene anti-black slurs.  *Id.* ¶ 257 n.18.

<u>Legal Standard</u>

To overcome a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 556).  The district court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party.  *Vietnam Ass'n*, 517 F.3d at 115.  A complaint containing only "labels and

conclusions" or "formulaic recitation[s] of the elements of . . . cause[s] of action" must be dismissed. *Twombly*, 550 U.S. at 555.

Discussion

In the operative complaint, plaintiff asserts six varieties of claims under § 1983, claims under §§ 1985(3) and 1986, a *Monell* claim, and various claims under New York State law. Am. Compl. ¶¶ 277–332. These claims are topically addressed.

I.    *Brady*

In the operative complaint, plaintiff appears to describe six *Brady* violations that infected his 1985 trial: (1) an unspecified individual or group's failure to disclose that Kim had said he "possibly" could identify Choi's stabber, Am. Compl. ¶¶ 58, 184 n.2; (2) Detective Norrito, Detective Tumbarello, ADA Sullivan, ADA Kallen, and ADA Greene's purported efforts to fabricate and conceal Kim's statement that Choi's stabber was a "tall guy," *id.* ¶¶ 69–81; (3) Detectives Norrito and Tumbarello's efforts to hide the fact that Lenny Best escaped from police custody, *id.* ¶¶ 96–103; (4) Detective Norrito, Detective Tumbarello, ADA Kallen, ADA Greene, ADA Mintz, and DA Gonzalez's concealment of the audiotape of the second Guerrier interview, *id.* ¶¶ 117–31; (5) Detective Norrito's denial and secreting of his interviews of two "Panamanians" in Guerrier's cab, as well as the City and unidentified prosecutors' role in hiding this evidence, *id.* ¶¶ 231–39; and (6) Detective Norrito, Detective Tumbarello, Detective Carter, and "each of the individual prosecutor defendants[']" efforts to suppress knowledge of immunizing deals granted to Mark Best and Furto, *id.* ¶¶ 192, 198, 278 n.19. Plaintiff also appears to allege that three pieces of evidence—the second Guerrier interview, the existence of deals with Mark Best and Furto, and Detective Norrito's interviews with the men in Guerrier's taxi—are still being suppressed, *id.*

13

¶¶ 130, 198, 213, 224, 239, 278 n.19, and argues that their ongoing suppression violates *Brady* and its progeny.

The state's obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), stem from the Fourteenth Amendment's guarantee of due process and protect a defendant's right to a fair trial. *Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001) (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)); *Schnitter v. City of Rochester*, 556 F. App'x 5, 7 n.2 (2d Cir. 2014). A successful *Brady* claim requires the plaintiff to show that (1) the state either willfully or inadvertently suppressed; (2) favorable evidence; (3) thereby prejudicing the plaintiff. *Fappiano v. City of New York*, 640 F. App'x 115, 118 (2d Cir. 2016) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). Evidence is favorable if it is either "exculpatory or impeaching." *Bellamy v. City of New York*, 914 F.3d 727, 751 (2d Cir. 2019). "[T]o show prejudice the [plaintiff] must demonstrate a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Id.* (internal quotation marks omitted) (quoting *United States v. Ulbricht*, 858 F.3d 71, 112 (2d Cir. 2017)). "A reasonable probability of a different result is a probability sufficient to undermine confidence in the outcome." *Kroemer v. Tantillo*, 758 F. App'x 84, 86 (2d Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)). A plaintiff was not prejudiced by a *Brady* violation if he "either knew or should have known of the essential facts permitting him to take advantage of any [favorable] evidence." *Hincapie v. City of New York*, 434 F. Supp. 3d 61, 76 (S.D.N.Y. 2020).

At the outset, plaintiff's *Brady* claims predicated on various defendants' alleged post-conviction conduct can be pruned on qualified immunity grounds. *See* Defs.' Mot., Dkt. 39, at 38–40. "Qualified immunity shields federal and state officials from money damages unless a

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Vega v. Semple*, 963 F.3d 259, 273 (2d Cir. 2020) (alterations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)).  A right is clearly established when "Supreme Court and Second Circuit precedent existing at the time of the alleged violation" place the "constitutional question beyond debate" such that "every reasonable official would have understood that what he is doing violates that right." *Bacon v. Phelps*, 961 F.3d 533, 545 (2d Cir. 2020) (citations omitted).  Defendants bear the burden of establishing their entitlement to qualified immunity, which at the pleading stage, is a "formidable hurdle." *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004).

With respect to this subset of plaintiff's *Brady* claims, the individual defendants have met their burden of showing that *Brady* and its progeny do not clearly apply post-conviction.  *See Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 68–69, 129 S. Ct. 2308, 2320, 174 L. Ed. 2d 38 (2009) (holding that "*Brady* is the wrong framework" post-conviction when a "criminal defendant [was] proved guilty after a fair trial"); *Haughey v. Cnty. of Putnam*, No. 18-CV-2861 (KMK), 2020 WL 1503513, at *10 (S.D.N.Y. Mar. 29, 2020) (collecting cases and determining that it is unclear "whether there is a right to disclosure of exculpatory evidence *post-conviction*, and if so, when that right became clearly established").  At least one district court has suggested that *Brady* applies post-conviction, and compels officials to come forward with favorable evidence, where "officials . . . *continue*[] to suppress post-conviction" evidence that was suppressed at trial. *See Haughey*, 2020 WL 1503513, at *10 n.5.  Yet at the same time, that court acknowledged that whether *Brady* compels production following a conviction tainted by *Brady* violations is an open question.  *Id.* at *10.  Thus, to the extent that the operative complaint includes

*Brady* claims predicated on post-conviction conduct, those claims are dismissed on qualified immunity grounds.

Moving on to plaintiff's six trial-based *Brady* claims, defendants argue that, because these claims necessarily imply that plaintiff's outstanding robbery conviction is invalid, they must be dismissed pursuant to the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994). There, an incarcerated plaintiff filed a § 1983 suit seeking money damages, alleging that government officials framed him for killing his wife. *Id.* at 478–79. Concluding that the plaintiff's claims were analogous to the common law tort of malicious prosecution because he sought "damages for confinement imposed pursuant to legal process," the Court grafted malicious prosecution's favorable termination requirement onto § 1983 claims, that, if successful, would "necessarily imply the invalidity of his conviction or sentence." *Id.* at 484–87. Such a rule, the Court held, respected "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments." *Id.* at 486. Because the plaintiff had not shown that his conviction was favorably terminated by being "reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus," the Court held that it had not accrued and was not cognizable. *Id.* at 489.

Read broadly, the *Heck* majority suggests that every § 1983 suit which implies the invalidity of an outstanding conviction must be dismissed. However, Justice Souter, joined by three other justices, penned a concurrence arguing that the favorable termination requirement applies only when a plaintiff is in custody and can seek redress in a federal forum by seeking habeas corpus relief. *Id.* at 500–03 (Souter, J., concurring). To Justice Souter, the favorable termination requirement is justified by the fact that the "specific" habeas statute controls, rather than the "'general' § 1983 statute," when a plaintiff is in custody. *Id.* at 497 (Souter, J., concurring)

16

(quoting *Preiser v. Rodriguez*, 411 U.S. 475, 489, 93 S. Ct. 1827, 1836, 36 L. Ed. 2d 439 (1973)). The rule does so by "forc[ing] prison inmates to follow the federal habeas route," even though their claims also fall within § 1983's ambit, "to prevent . . . the habeas statute from being undermined." *Id.* at 501 (Souter, J., concurring). But, to Justice Souter, extending the favorable termination requirement to individuals for whom habeas is unavailable would "deny any federal forum for claiming a deprivation of federal rights to those who cannot first obtain a favorable state ruling," a conclusion at odds with § 1983's text and original intent. *Id.* at 500–02 (Souter, J., concurring). Responding to Justice Souter in a footnote, the majority disagreed, instead noting that the favorable termination requirement "is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated." *Id.* at 490 n.10.

Unpersuaded by the majority, Justice Souter hewed to his position four years later in *Spencer v. Kemna*, suggesting that a "former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy." 523 U.S. 1, 21, 118 S. Ct. 978, 990, 140 L. Ed. 2d 43 (1998) (Souter, J., concurring). Three justices joined Justice Souter's concurrence, including Justice Ginsburg, who had signed on to the *Heck* majority. *See id.* at 18 (Souter, J., concurring); *id.* at 21 (Ginsburg, J., concurring). And Justice Stevens, though he dissented in *Spencer*, agreed with Justice Souter that when habeas relief is unavailable, *Heck* does not bar a § 1983 suit. *Id.* at 25 n.8 (Stevens, J., dissenting). Though not in the majority, five justices in *Spencer* supported limiting *Heck*'s favorable termination rule to incarcerated plaintiffs who can seek habeas relief.

Looking to this Supreme Court dicta, the "Second Circuit has joined the majority of Circuits in rejecting the interpretation that *Heck* serves as an absolute bar against *all* section 1983

damage claims where the underlying conviction, sentence, or parole revocation has not, and cannot be invalidated." *Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 456 (E.D.N.Y. 2018) (collecting cases); *see also Wilson v. Midland Cnty.*, 89 F.4th 446, 457 (5th Cir. 2023), *vacated on reh'g en banc*, 92 F.4th 1150 (5th Cir. 2024) ("The current line-up is 6–5 in favor of those circuits holding that *Heck* does *not* bar a § 1983 claim when the plaintiff is not in custody, since there is no collision at the § 1983/habeas intersection.").

The Second Circuit first articulated an exception to *Heck*'s favorable termination requirement in two cases decided on the same day in 1999: *Jenkins v. Haubert*, 179 F.3d 19 (2d Cir. 1999) and *Leather v. Eyck*, 180 F.3d 420 (2d Cir. 1999). First, in *Jenkins*, the Second Circuit held that *Heck* did not bar "a § 1983 claim challenging the conditions of a prisoner's confinement where the prisoner is unable to challenge the conditions through a petition for federal habeas corpus." 179 F.3d at 21. In part, the panel's decision rested on its belief that "apply[ing] the *Heck* rule in such circumstances would contravene the pronouncement of five justices that some federal remedy—either habeas corpus or § 1983—must be available." *Id.* at 27.

Next, in *Leather*, the Second Circuit applied that language from *Jenkins*, holding that a plaintiff who was convicted of an offense but was fined and "never was in the custody of the State" had "escaped the jaws of *Heck*" and could bring a § 1983 suit that took direct aim at his outstanding conviction. 180 F.3d at 422–24. In so doing, the Second Circuit treated *Heck* footnote ten as dicta, a conclusion that the Supreme Court itself has gestured toward. *See Muhammad v. Close*, 540 U.S. 749, 752 n.2, 124 S. Ct. 1303, 1305 n.2, 158 L. Ed. 2d 32 (2004) ("Members of the Court have expressed the view that unavailability of habeas for other reasons may also dispense with the *Heck* requirement. This case is no occasion to settle the issue.") (internal citations omitted); *see also Nance v. Ward*, 597 U.S. 159, 167, 142 S. Ct. 2214, 2221, 213 L. Ed. 2d 499 (2022) ("[W]e

18

have not read § 1983 literally in the *prisoner context*. To the contrary, we have insisted that § 1983 contains an 'implicit exception' for actions that lie 'within the core of habeas corpus.'") (internal citations omitted) (emphasis added).

Drawing principally on *Spencer*, *Jenkins*, and *Leather*, in 2013, a Second Circuit panel held that *Heck*'s favorable termination requirement did not apply to a § 1983 plaintiff who was convicted of an offense, had that conviction vacated due to *Brady* violations, subsequently pleaded guilty to a lesser offense, and filed a federal suit under § 1983 based on those *Brady* violations following his release from custody. *Poventud v. City of New York*, 715 F.3d 57, 58–62 (2d Cir. 2013) ("*Poventud I*"), *vacated on reh'g en banc*, 750 F.3d 121 (2d Cir. 2014). Because the plaintiff could not pursue habeas relief, the panel majority held that § 1983 remained a viable method of seeking federal relief. *Id.* at 62. The majority treated *Heck* footnote ten as dicta, noted that the Second Circuit had "adopted Justice Souter's dicta in *Spencer*," and relied on both *Jenkins* and *Leather*. *Id.* at 61–62. However, following rehearing *en banc*, the Second Circuit vacated the panel decision and affirmed the plaintiff's ability to sue on the grounds that his suit challenged his first, vacated conviction, not his second, outstanding conviction. *Poventud v. City of New York*, 750 F.3d 121, 136–38 (2d Cir. 2014) ("*Poventud II*") (*en banc*).

Both plaintiff and defendants invoke one other Supreme Court decision that bears mentioning, *McDonough v. Smith*, 588 U.S. 109, S. Ct. 2149, L. Ed. 2d 506 (2019). Plaintiff argues that, under *McDonough*, his *Brady* claims are timely because they accrued only when the New York Court of Appeals denied him leave to appeal in 2019. *See* Pl.'s Opp., Dkt. 41, at 37–40, 46–47. Defendants rely on *McDonough* to argue that plaintiff's claims have not yet accrued because his conviction has not been overturned. Defs.' Reply, Dkt. 42, at 18, 25. Both of these arguments miss the mark. In *McDonough*, the plaintiff alleged that the defendant prosecutor

19

fabricated inculpatory evidence, used that evidence to secure an indictment, and brought plaintiff to trial twice, the first ending in a mistrial and the second in acquittal. 588 U.S. at 112–13. Just under three years after his acquittal, the plaintiff brought a § 1983 fabricated evidence claim against the defendant prosecutor. *Id.* at 113–14. The Second Circuit held that the suit was untimely because the plaintiff's fabrication-of-evidence claim had accrued while his prosecution was ongoing. *Id.*

The Supreme Court reversed, holding that fabrication of evidence claims can accrue at two distinct points—when a "criminal proceeding has ended in the defendant's favor," i.e., acquittal, *or* when "a resulting conviction has been invalidated within the meaning of *Heck*." *Id.* at 120. The Court analogized plaintiff's fabrication-of-evidence claim to the tort of malicious prosecution because "both claims challenge the integrity of criminal prosecutions undertaken 'pursuant to legal process.'" *Id.* at 116–17 (quoting *Heck*, 512 U.S. at 484). The Court concluded that "the concerns with parallel litigation and conflicting judgments" that animated *Heck* were as applicable to ongoing criminal prosecutions as they were to outstanding criminal convictions. *Id.* at 117–19.

The first part of the Court's holding is easy enough to parse. The Second Circuit has characterized *McDonough* as "extend[ing] the rule announced in *Heck* to ongoing criminal prosecutions." *Smalls v. Collins*, 10 F.4th 117, 134 (2d Cir. 2021). Viewed from this angle, *McDonough* effectively cabins an earlier decision, *Wallace v. Kato*, 549 U.S. 384, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007). There, the Court had held that *Heck* does not apply to false-arrest claims brought during ongoing prosecutions because *Heck* applies only to outstanding convictions, not "anticipated future conviction[s]." *Id.* at 393–94. The *McDonough* Court distinguished *Wallace*, holding that, when a prosecution is ongoing, *Heck* does not bar claims analogous to false arrest because they have "li[v]e[s] independent of an ongoing trial or putative future conviction,"

whereas it does bar claims analogous to malicious prosecution because such claims "directly challenge[]—and thus necessarily threaten[] to impugn—the prosecution itself." *McDonough*, 588 U.S. at 122.

Because plaintiff's prosecution ended decades ago, *McDonough*'s central holding is not relevant here. However, the *McDonough* Court's description of *Heck* suggests that, post-conviction, a § 1983 claim that is analogous to malicious prosecution accrues only once the conviction has been favorably terminated, regardless of whether habeas relief is available. The Seventh Circuit, for instance, has relied on *McDonough* to overrule its decisions recognizing an exception to *Heck* when habeas relief is unavailable. *See Savory v. Cannon*, 947 F.3d 409, 422–27 (7th Cir. 2020) (*en banc*). The Seventh Circuit reasoned that because the *McDonough* plaintiff was not in custody while being prosecuted, the favorable termination rule applies even in cases that do "not implicate concerns about habeas corpus." *Id.* at 420–22, 425–28. Instead, the Seventh Circuit concluded that favorable termination is an element of § 1983 claims that are analogous to malicious prosecution, and thus, favorable termination is a prerequisite to accrual. *Id.* at 427.

However, this reading of *McDonough* is at odds with Second Circuit precedent in two distinct ways. First, while true that *McDonough* did not confront the intersection between habeas and § 1983, it does not follow that it endorsed consigning § 1983 plaintiffs to a legal Twilight Zone. Under the Seventh Circuit's approach, state officials can evade federal review by wrongfully securing convictions that carry sentences so short that habeas relief is not attainable. *See Savory*, 947 F.3d at 433–34 (Easterbrook, J., dissenting). Or state officials can prevent a § 1983 claim from ever accruing by covering up any trace of their misconduct until after the defendant is released from custody. *See Wilson*, 89 F.4th at 450–51. By countenancing such outcomes, the Seventh Circuit's approach runs headlong into the Second Circuit's command that

21

"where federal habeas corpus is not available to address constitutional wrongs, § 1983 must be." *Jenkins*, 179 F.3d at 26 (2d Cir. 1999); *Huang v. Johnson*, 251 F.3d 65, 75 (2d Cir. 2001).

Second, the Seventh Circuit's holding in *Savory* also rests, in part, on its conclusion that *McDonough* made favorable termination an element of § 1983 claims that are analogous to malicious prosecution, and thus, favorable termination is always prerequisite to accrual. *Savory*, 947 F.3d at 427. But, this brings on the clash. The Second Circuit has rejected this interpretation, holding that "*McDonough* did not alter the substantive elements of a fabricated-evidence claim as it is understood in this Circuit." *Smalls*, 10 F.4th at 135–36. By refusing to treat favorable termination as an element of fabrication-of-evidence claims, the Second Circuit appears to have preserved the vitality of the *Jenkins/Leather* exception.

Bolstering this conclusion, the Second Circuit and courts throughout this circuit have continued to recognize the availability of the *Jenkins/Leather* exception, even after *Poventud II* and *McDonough*. *See, e.g.*, *Wiggins v. Mellia*, No. 14-591-CV, 2023 WL 6222303, at *2 (2d Cir. Sept. 26, 2023) ("There is, however, a narrow exception to the *Heck* bar that permits a § 1983 suit where federal habeas relief is unavailable."); *Hincapie v. City of New York*, No. 18-CV-3432 (PAC), 2022 WL 2870411, at *7 (S.D.N.Y. July 21, 2022) ("[The Second Circuit] has held that *Heck* does not bar § 1983 suits brought by plaintiffs who have no habeas recourse."); *Joseph v. Cuomo*, No. 20-CV-3957 (PKC) (LB), 2021 WL 200984, at *3 (E.D.N.Y. Jan. 20, 2021) ("The Second Circuit has found that in situations which fall into the gray area between habeas and § 1983, 'some federal remedy—either habeas corpus or § 1983—must be available.'") (quoting *Jenkins*, 179 F.3d at 27); *Lee v. City of Troy*, 520 F. Supp. 3d 191, 209 (N.D.N.Y. 2021) ("[T]his Circuit recognizes . . . that *Heck* cannot bar a claim if habeas corpus remedies are not available.").

However, while the exception exists, "dispute remains in the Second Circuit as to the scope

22

and limits of the exception to *Heck*'s favorable-termination rule." *Opperisano*, 286 F. Supp. 3d at 457–58.  On the one hand, following *Poventud II*, Judge Calabresi supported a broad exception, stating that "*Heck* does not bar § 1983 claims when habeas is unavailable, at least so long as the unavailability was not intentionally caused by the plaintiff." *Teichmann v. New York*, 769 F.3d 821, 830 (2d Cir. 2014) (Calabresi, J., concurring).  Then-Judge Livingston, by contrast, synthesized a narrower exception, one that applies only "when habeas was *never* reasonably available to the plaintiff through no lack of diligence on his part—that is, where an action under § 1983 was a diligent plaintiff's only opportunity to challenge his conviction in a federal forum." *Id.* at 828 (Livingston, J., concurring).  Some district courts in this circuit have read the *Jenkins/Leather* exception in the same manner as Judge Calabresi, applying it "without considering the diligence of the claimant," whereas others "have adopted Judge Livingston's narrower position." *Opperisano*, 286 F. Supp. 3d at 458–59 (collecting cases).  Consistent with the *Opperisano* court, this Court adopts Chief Judge Livingston's view, as no circuit has "allow[ed] unfettered access to [§] 1983 claims solely because of a present inability to obtain habeas relief," and her approach accommodates the concerns animating *Jenkins* and *Leather* while falling within *Heck*'s holding.  *See id.* at 459–60.

Under this rule, the "'*Jenkins/Leather*' exception . . . provide[s] claimants two ways to avoid *Heck*'s favorable-termination rule: (1) due diligence in pursuing habeas or similar relief; or (2) too brief a period in custody to pursue habeas relief as a matter of law." *Id.* at 460.  Under the first pathway, "the applicability of the exception should generally be determined on a case-by-case basis, in consideration of the specific circumstances involved." *Id.*  Significantly, federal courts have jurisdiction over a habeas petition only when the petitioner is in custody, which includes both incarceration and parole. *Id.* at 455 n.7 (citations omitted).  Under the second pathway, though the

"Second Circuit has yet to establish a minimum period of time that is necessary for habeas relief to have been reasonably available as a matter of law," "Judge Livingston [has] suggested that a year may be at the outer limits of the exception." *Id.* at 460. The plaintiff bears the burden of establishing his eligibility for the *Jenkins/Leather* exception. *Id.*

After determining that the exception applies, the next task is to fix the date of accrual. "[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Wallace v. Kato*, 549 U.S. 384, 388, 127 S. Ct. 1091, 1095, 166 L. Ed. 2d 973 (2007). Generally, for § 1983 claims, "accrual occurs when the plaintiff has a complete and present cause of action." *Id.* (cleaned up). "Likewise, accrual under the *Jenkins/Leather* exception should begin when the section 1983 claim becomes available—once habeas is no longer available, despite due diligence." *Opperisano*, 286 F. Supp. 3d at 464. Once that accrual trigger fires, New York state law supplies the relevant statute of limitations, which is three years. *Kane v. Mount Pleasant Cent. Sch. Dist.*, 80 F.4th 101, 108 (2d Cir. 2023).

Applying this rule of decision, plaintiff's *Brady* claims necessarily imply the invalidity of his outstanding robbery conviction. *See Poventud II*, 750 F.3d at 132–33. Thus, these claims are barred by *Heck*'s favorable termination rule unless the *Jenkins/Leather* exception applies. On the facts pleaded, it does not. Plaintiff does not attempt to explain what, if any, efforts he made to discover his *Brady* claims while habeas relief was available. This failure is particularly lethal when juxtaposed with plaintiff's allegation that, in February 1991 and April 1992, Mark Best prepared affidavits in which he claimed to have participated in Choi's slaying, accepted a "deal" from Detective Norrito, and falsely accused Greene. Am. Compl. ¶ 199 n.8. Plaintiff does not describe why Mark Best prepared the affidavit or when he gained access to it. Because "due diligence still 'demand[s] something more than . . . no diligence at all,'" it is doubtful that plaintiff

24

satisfies the exception.  *See Nieves v. LaClair*, No. 14-CV-108 (MKB), 2021 WL 2313184, at *9 (E.D.N.Y. June 7, 2021) (citation omitted).  Therefore, his remaining *Brady* claims are dismissed with prejudice.[6]

Nonetheless, assuming that plaintiff's *Brady* claims satisfy the *Jenkins/Leather* exception, the Court favorably construes the complaint to allege that his claims accrued in May 1994.  *See supra* n.4.  At that time, the statute of limitations on plaintiff's *Brady* claims started to run, causing them to expire in May 1997.  Plaintiff raises two arguments in an attempt to sidestep the statute of limitations.  First, he argues that the continuing violation doctrine renders his *Brady* claims timely.  Pl.'s Opp. at 47–48.  Second, he contends that the statute of limitations should be equitably tolled from the time his claims accrued until 2019, when, he says, he finally learned the full extent of his *Brady* claims.  Pl.'s Opp. at 40–47.

The continuing violation doctrine carves out an "exception to the normal knew-or-should-have-known accrual date."  *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)).  A claim that is "composed of a series of separate acts that collectively constitute one unlawful practice" accrues, and the statute of limitations begins to run, "when the defendant has engaged in enough activity to make out an actionable claim."  *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (internal alterations omitted) (first quoting *Washington v. Cty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004); then quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111, 122 S. Ct. 2061, 2074, 153 L.

---

[6] Typically, "[d]isposition of the case on *Heck* grounds . . . warrants only dismissal *without* prejudice, because the suit may be reinstituted should plaintiff's conviction be 'expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.'"  *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999) (quoting *Heck*, 512 U.S. at 487).  However, because these claims would be time barred regardless, the Court dismisses them with prejudice.

Ed. 2d 106 (2002)).  "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation,' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Id.* (internal alteration omitted) (quoting *Morgan*, 536 U.S. at 114–15).  As a "general matter, the continuing violation doctrine is heavily disfavored in the Second Circuit and courts have been loathe to apply it absent a showing of compelling circumstances." *Gentile v. Potter*, 509 F. Supp. 2d 221, 234 (E.D.N.Y. 2007) (quoting *Trinidad v. N.Y. City Dep't of Corr.*, 423 F. Supp. 2d 151, 165 n.11 (S.D.N.Y. 2006).  Reflecting its disfavored status, courts have applied the continuing doctrine in "limited contexts," such as "Title VII discrimination and retaliation claims, Eighth Amendment claims of medical indifference brought under [§] 1983, and Eighth Amendment claims for cruel and unusual punishment against federal officials brought under *Bivens*." *Kwas v. Intergraph Gov't Sols.*, No. 15-CV-5897 (JFB) (AYS), 2016 WL 4502039, at *2 (E.D.N.Y. Aug. 24, 2016).

Wish as he might, the continuing violation doctrine does not apply to plaintiff's *Brady* claims.  Off the top, this case is not one of the recognized "limited contexts" where the doctrine applies, and plaintiff fails to cite a single decision where a court has extended the doctrine to a *Brady* claim brought under § 1983. *See* Pl.'s Opp. at 47–48.  This is unsurprising. *Brady* violations do not fit the continuing violation doctrine's mold.  Each violation is a discrete, actionable constitutional violation. *See United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006); *Schnitter*, 556 F. App'x at 7 n.2.  Trying to masquerade his discrete *Brady* violations as ongoing, plaintiff contends that defendants' alleged suppression of favorable evidence harmed him not only at his 1985 trial but "throughout the criminal proceedings." Pl.'s Opp. at 47.  This argument is premised on a fundamental misunderstanding of the continuing violation doctrine.  That doctrine applies to

26

"continuing unlawful wrongs," not, as plaintiff desires, to "the continuing effects of earlier wrongful conduct." *See Corsini v. City of New York*, No. 20-CV-5459 (MKB), 2021 WL 5999631, at *8 (E.D.N.Y. Dec. 20, 2021) (cleaned up). Properly understood, the continuing violations doctrine, sadly, cannot salvage plaintiff's *Brady* claims.

Unable to get the accrual date to budge, plaintiff's equitable tolling argument supplies the last glimmer of hope. Since New York state law supplies the relevant statute of limitations, it also supplies the relevant tolling rules. *Williams v. Walsh*, 558 F.2d 667, 674 (2d Cir. 1977). Equitable tolling applies to § 1983 suits and permits courts to "extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances." *Lopez v. Nassau Cnty. Sheriffs Dep't*, No. 17-CV-3722 (DRH) (GRB), 2018 WL 3321430, at *4 (E.D.N.Y. July 5, 2018) (quoting *Johnson v. Nyack Hosp*., 86 F.3d 8, 12 (2d Cir. 1996)). It is a doctrine that applies in "rare and exceptional circumstances." *Id.* (internal quotation marks omitted) (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)). "Generally, a litigant seeking equitable tolling bears the burden of establishing two elements: (1) that she has been pursuing her rights diligently, and (2) that some extraordinary circumstance stood in her way." *Clark v. Hanley*, 89 F.4th 78, 92 (2d Cir. 2023) (internal alterations omitted) (quoting *Smalls*, 10 F.4th at 145)). For instance, "when the defendant fraudulently conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." *Ellis v. Wilkinson*, 81 F. Supp. 3d 229, 235 (E.D.N.Y. 2015) (quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983)). Equitable tolling does not apply where a plaintiff is aware that a cause of action exists, even where a defendant fraudulently conceals "facts that, if known, would enhance a plaintiff's ability to prevail as to a cause of action of which the plaintiff was previously aware." *Pearl v. City of Long Beach*, 296 F.3d 76, 84 (2d Cir. 2002). Ultimately, assuming that a plaintiff

has been diligently pursuing her rights and was blocked by extraordinary circumstances, district courts bring "discretionary considerations to bear in deciding whether to permit equitable tolling." *Clark*, 89 F.4th at 92 (quoting *Doe v. United States*, 76 F.4th 64, 71 (2d Cir. 2023)).

Here, plaintiff argues that his remaining *Brady* claims should be equitably tolled from the point they expired to August 2019. *See* Pl.'s Opp. at 40–41. He contends that tolling the statute of limitations up to August 2019 is appropriate because that is when he became aware of "the *full extent* of the [d]efendants' wrongdoing." *Id.* (emphasis added). His argument suffers from multiple infirmities. For starters, the complaint does not establish that plaintiff learned about a single cause of action in 2019—he does not describe what he learned in 2019 or how that evidence led him to uncover any of his six remaining *Brady* claims. It is also implausible. Plaintiff does not attempt to explain how or why he suddenly discovered mysterious, additional information about defendants' purported wrongdoing only after the New York Court of Appeals denied him leave to appeal the denial of his § 440 petition in 2019. And at various times, plaintiff lets on that he knew about his *Brady* claims prior to 2019. For instance, by saying that he became aware of the *full extent* of the defendants' alleged misconduct in 2019, plaintiff reveals that, at that time, he ostensibly obtained "more persuasive evidence, not newly developed awareness of a previously concealed cause of action." *See Pearl*, 296 F.3d at 85. More damning still, plaintiff admits in the operative complaint that he raised his "newly-discovered evidence" in his § 440 petition, essentially conceding that he was aware of his *Brady* claims as early as 2017. *See* Am. Compl. ¶ 239, 245–46.

Reinforcing this conclusion is that nearly all of the alleged *Brady* violations plaintiff includes in the operative complaint were in the public domain years before plaintiff commenced this action. For instance, in 2005, during his fourth § 440 petition, Greene testified in open court

28

that he believed Lenny Best had escaped from a police car. *Greene v. City of New York*, No. 08-CV-243 (AMD) (CLP), Gragg Decl. Ex. 51, Dkt. 285-51, at 27, 36, 38–40.[7] Three years later, Greene, in his § 1983 complaint—using language almost identical to that found in plaintiff's operative complaint—alleged that law enforcement suppressed Kim's "tall guy" statement, Guerrier's second interview, and Lenny Best's escape from police custody. *Greene v. City of New York et al.*, No. 08-CV-243 (AMD) (CLP), Compl., Dkt. 1, ¶¶ 93–105, 124–38, 156–63. A transcript of Greene's 2005 testimony, in which he alleged that Lenny Best escaped from custody, was posted on the public docket in his § 1983 suit in November 2016. *See Greene v. City of New York et al.*, No. 08-CV-243 (AMD) (CLP), Gragg Decl. Ex. 51, Dkt. 285-51. And Judge Donnelly discussed Kim's "tall guy" statement, the Guerrier interview, Norrito's interview with men in Guerrier's taxi, Mark Best's reputed "deal," and Lenny Best's purported escape in her decision dismissing Greene's complaint following a motion for summary judgment in March 2017. *See Greene*, 2017 WL 1030707, at *2–3, 5, 13, 20, 24–26, 28, 31.

Moreover, with respect to that very same period of time, plaintiff readily admits that he had a lawyer working on his own § 440 petition. Am. Compl. ¶ 176. A cursory Internet search would have revealed all of the information in Judge Donnelly's comprehensive opinion. Therefore, "publicly available information" would have "triggered a reason to inquire" with respect to all of plaintiff's claims. *See Phillips v. Generations Fam. Health Ctr.*, 657 F. App'x 56,

---

[7] "A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks omitted) (quoting *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992)). For instance, as is the case here, courts may look to documents filed on the public docket "to determine what statements the documents contain." *See Great Am. Ins. Co. v. Houlihan Lawrence, Inc.*, 449 F. Supp. 3d 354, 360 n.3 (S.D.N.Y. 2020) (internal quotation marks and alterations omitted) (quoting *Piazza v. Fla. Union Free Sch. Dist.*, 777 F. Supp. 2d 669, 678 (S.D.N.Y. 2011)).

59 (2d Cir. 2016); *see also Newman v. Greystone & Co.*, 167 A.D.3d 915, 916 (N.Y. App. Div. 2018) (holding that equitable tolling did not apply where "plaintiff had the means to ascertain the facts from available public records, but failed to do so"). Bluntly put, if plaintiff failed to become aware of his remaining *Brady* claims by 2017, it was due to his own lack of diligence. Equitable tolling, therefore, would not apply to plaintiff's remaining *Brady* claims. Finally, even if Williams satisfied the *Jenkins/Leather* exception, his *Brady* claims would be time barred.[8]

## II.    False Arrest

Turning from *Heck* and its accrual rules to Williams's claim for false arrest, the latter claim is clearly time barred. "A [§] 1983 claim for false arrest rests on an individual's Fourth Amendment right to be free from unreasonable seizures, including arrests without probable cause." *Greene*, 2017 WL 1030707, at *17. A false arrest claim accrues and the statute of limitations begins to run once the false imprisonment ends, meaning the plaintiff is detained by formal process—that is, "once the [plaintiff] becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 388–89. Because plaintiff was arraigned in mid-1983, *see* Am. Compl. ¶¶ 154–55, the statute of limitations ran on

---

[8] Plaintiff also argues that the doctrines of equitable estoppel and fraudulent concealment render his *Brady* claims timely. *See* Pl.'s Opp. at 39–44. They do not. "New York law does not distinguish between the doctrines [of equitable tolling, equitable estoppel, and fraudulent concealment] and applies the same analysis" to each. *See Corp. Trade, Inc. v. Golf Channel*, 563 F. App'x 841, 841 (2d Cir. 2014); *Rochester v. Sixth Precinct Police Station*, 370 F. App'x 244, 245 (2d Cir. 2010); *see also Halstead v. City of New York*, No. 13-CV-4874 (MKB), 2015 WL 1506133, at *4 (E.D.N.Y. Mar. 31, 2015) (equating the doctrines). For that reason, plaintiff's equitable estoppel and fraudulent concealment arguments fail on the grounds articulated above. Plaintiff also invokes something called the "trusted defendant standard," which he asserts is a special species of equitable tolling that applies when the party concealing the existence of a cause of action has a "duty to disclose his wrongdoing to the plaintiff." *See* Pl.'s Opp. at 43–45. This so-called standard lacks support in our precedent. Plaintiff rests his argument on a single law student note that advocates the creation of such a doctrine and fails to cite a single case recognizing or applying the standard. *See id.* Accordingly, this argument fails.

his false arrest claim sometime in 1986.  Equitable tolling does not save his false arrest claim from the statute of limitations.  Plaintiff could have filed a complaint asserting his false arrest claim by 1986.  By any standard, to be sure, Williams has not diligently pursued his 1983-vintage false arrest claim by raising it in 2021.  *See Covington v. New York City Police Dep't*, 471 F. App'x 28, 29–30 (2d Cir. 2012).  Brought almost four decades too late, plaintiff's false arrest claim is dismissed with prejudice.

     III.    Confrontation Clause/Fabrication of Evidence

Williams's Confrontation Clause claim cannot escape *Heck*.  A § 1983 claim predicated on violations of a plaintiff's right to confront his accusers necessarily implies the invalidity of a conviction secured by that constitutional violation.  *See Evans v. McBride*, 94 F.3d 1062, 1064–65 (7th Cir. 1996).  Because plaintiff's conviction is outstanding, *Heck* bars the claim unless the *Jenkins/Leather* exception applies.  Plaintiff satisfies neither of the exception's two pathways.  He had six years to exhaust his state remedies and file a habeas petition; his time in state custody was not so short that it precluded habeas relief as a matter of law.  *See Opperisano*, 286 F. Supp. 3d at 460.  And with respect to this claim, plaintiff has not alleged that he diligently pursued habeas or state post-conviction relief while incarcerated.  Indeed, plaintiff's purported inability to confront his accusers would have been apparent at trial, and he had nine years to raise his Confrontation Clause claims in collateral proceedings, yet chose not to.  Because Plaintiff did not diligently pursue those claims, he cannot now invoke the *Jenkins/Leather* exception.  *See Opperisano*, 286 F. Supp. 3d at 462–63; *Palmenta v. Blank*, No. 18-CV-1078 (SRU), 2018 WL 4516676, at *3 (D. Conn. Sept. 20, 2018).  Hence, this claim is barred by *Heck*, has not accrued, and is dismissed with prejudice.

31

Seeking to breathe new life into this claim in his opposition papers, plaintiff attempts to recast it as a series of Sixth Amendment fair trial claims based on the fabrication of evidence. *See* Pl.'s Opp. at 51–53. The complaint, however, does not include such a claim. In fact, the only Sixth Amendment claim it mentions is that "[p]laintiff was deprived of his Sixth Amendment right to confront the witnesses (informants) against him." Am. Compl. ¶ 278. Plaintiff's failure to include this claim in his complaint is alone sufficient to dismiss it. *See Cadet v. Equifax Credit Servs.*, No. 05-CV-4843 (SLT) (LB), 2008 WL 189873, at *2 n.1 (E.D.N.Y. Jan. 18, 2008); *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y. 2013).

Williams' second-thought assault seeking to repackage his pleadings to include a fabrication of evidence claim is stymied not only by the operative complaint's failure to plausibly plead facts that would support such a claim but also because any such claim would be time barred. "The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, [and] Fourteenth Amendments of the U.S. Constitution." *Hincapie*, 434 F. Supp. 3d at 75 n.8. "To state a fair trial right claim, a plaintiff must plausibly plead the following elements: (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Hutchins v. Solomon*, No. 16-CV-10029 (KMK), 2018 WL 4757970, at *16 (S.D.N.Y. Sept. 29, 2018) (internal quotation marks omitted) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)). "[I]n the context of a fabrication of evidence claim, the Second Circuit equates 'the fraudulent omission of factual information . . . with the affirmative perpetration of a falsehood,' and expressly disclaims any 'plausible legal distinction between misstatements and omissions.'" *Id.* at *17 (quoting *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015)).

Though far from clear, the factual premises for these claims appear to be the same as for plaintiff's *Brady* claims. *See* Pl.'s Opp. at 51. They suffer an identical fate. By their nature, they imply the invalidity of plaintiff's outstanding 1985 conviction and are barred by *Heck* unless the *Jenkins/Leather* exception applies. *See Opperisano*, 286 F. Supp. 3d at 460. As described above, plaintiff has failed to plausibly allege that his sentence was too short to pursue habeas relief or that he diligently pursued habeas relief. Thus, any fabrication-of-evidence claims are barred by *Heck* in any case.

But assuming, in plaintiff's favor, that they accrued when habeas relief became unavailable in 1994, they are time barred. *See id.* at 463–64. Neither the continuing violation doctrine nor equitable tolling serve as a *deus ex machina*. And, as described above, this is not a recognized context where the continuing violation doctrine applies, *see Kwas*, 2016 WL 4502039, at *2. Williams fails to cite a single decision extending the doctrine to fabrication of evidence claims, *see* Pl.'s Opp. at 47–48, and it is not intended that this decision will create one. Beyond that, equitable tolling, again, does not apply because, as discussed above, plaintiff does not allege when he learned about these claims, appears to have learned about them by 2017, and in any event, should have been on inquiry notice by that point in time. Accordingly, these claims are time barred and are dismissed with prejudice.

IV.    Right of Access to Courts

The operative complaint also states claims alleging that defendants violated plaintiff's First Amendment[9] right of access to the courts. *See* Am. Compl. ¶ 278. Plaintiff seems to allege that

---

[9] In the operative complaint, plaintiff asserts that defendants violated his "Fourteenth Amendment right to equal privileges and immunities of the laws," but does not specify how. Am. Compl. ¶ 278. Because "the Supreme Court has grounded the right of access to the courts in the Privileges and Immunities Clause of Article IV," in addition to "the Petition Clause of the First Amendment,

(1) the individual defendants failed to come forward with the evidence that forms the basis of his *Brady* claims; (2) ADA Mintz suppressed, during what appears to have been one of Greene's § 440 petitions, the Guerrier interview from Greene while responding to a discovery request, Am. Compl. ¶ 224 n.12; and (3) DA Gonzalez refused to respond to plaintiff's appeal for "items" made at an unspecified time and in an unspecified manner, *id.*

There are two types of right-of-access claims. In "forward-looking" right-of-access claims, plaintiffs "allege that systemic official action frustrated their ability to file a suit" and seek relief that will put them "in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Sousa v. Marquez*, 702 F.3d 124, 127 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Christopher v. Harbury*, 536 U.S. 403, 413–14, 122 S. Ct. 2179, 2185–86, 153 L. Ed. 2d 413 (2002)). In "backward-looking" right-of-access claims, plaintiffs allege that, for instance, "official action caused the loss or inadequate settlement of a meritorious case" such that the plaintiffs' suits "cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Id.* at 127–28 (internal quotation marks omitted) (quoting *Christopher*, 536 U.S. at 413–14).

The Second Circuit has recognized the viability of forward-looking right-of-access claims but has cautioned that "[t]he viability of backward-looking right-of-access claims is far from clear

---

the Due Process Clauses of the Fifth and Fourteenth Amendments, and the Equal Protection Clause of the Fourteenth Amendment," it appears that plaintiff has tried to ground his right-of-access claims in the Privileges and Immunities Clause of Article IV, as well as in the Petition Clause. *See Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004) (citing *Christopher v. Harbury*, 536 U.S. 403, 415 n.12, 122 S. Ct. 2179, 2186 n.12, 153 L. Ed. 2d 413 (2002)). To the extent that plaintiff attempts to assert a standalone Privileges or Immunities Clause claim under the Fourteenth Amendment, it fails on qualified immunity grounds, as neither the Supreme Court nor the Second Circuit have applied that constitutional provision to the circumstances described in the operative complaint. *See Levine v. McCabe*, 357 F. Supp. 2d 608, 618–19 (E.D.N.Y. 2005), *aff'd*, 327 F. App'x 315 (2d Cir. 2009).

in this Circuit." *Id.* at 128.  At the same time, the Second Circuit has said that if it were to recognize backward-looking claims, they would be available only where "governmental action caused the plaintiff's suit to be dismissed as untimely" or "if official misconduct was so severe as to render hollow [plaintiff's] right to seek redress." *Id.* (internal quotations, alterations, and citations omitted).  Significantly, "when a plaintiff in a backward-looking access suit alleges that the government concealed or manipulated relevant facts, the claim may not proceed if the plaintiff was, at the time of the earlier lawsuit, aware of the facts giving rise to his claim." *Id.*

In the operative complaint, plaintiff does not specify whether he is asserting forward or backward-looking right of access claims, nor does he specify which allegations in the complaint form the basis of his claims.  However, in his opposition papers, plaintiff frames these claims as backward-looking right-of-access claims, an argument that needs clarification; the complaint can be read to say defendants blocked his ability to launch post-conviction challenges to his robbery conviction by filing a federal habeas corpus petition, which is an impossibility.  *See* Pl.'s Opp. at 50.  Further supporting the conclusion that plaintiff asserts a backward-looking, and not a forward-looking claim, is the fact that he does not seek injunctive relief, only monetary damages.  *See* Am. Compl. ¶ 332; *see also Gagain v. Scirpo*, No. 09-CV-00571 (CSH), 2013 WL 6839466, at *6 (D. Conn. Dec. 27, 2013) (inferring that the plaintiff asserted a backward-looking access-to-court claim because the requested relief would not "place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed").

Defendants are entitled to qualified immunity on these claims.  Neither the Supreme Court nor the Second Circuit has announced that backward-looking right-of-access claims are constitutionally cognizable.  *See Sousa*, 702 F.3d at 127–28; *Kern v. Contento*, No. 21-1672, 2022

WL 1112767, at *3 (2d Cir. Apr. 14, 2022) (noting that the Second Circuit still has not passed on the viability of backward-looking right-to-access claims).

Even assuming that the Second Circuit has recognized backward-looking right of access claims, such a right does not appear to encapsulate an affirmative requirement that law enforcement personnel come forward with exculpatory evidence post-conviction. As discussed above, *Brady* and its progeny do not clearly compel such action post-conviction. *See Osborne*, 557 U.S. 52, 68–69; *Haughey v. Cnty. of Putnam*, No. 18-CV-2861 (KMK), 2020 WL 1503513, at *10 (S.D.N.Y. Mar. 29, 2020). Nor does plaintiff cite a single Supreme Court or Second Circuit decision imposing such a requirement as a component of the constitutional right of access to the courts.

The only Second Circuit decision plaintiff cites in support of his argument, *Barrett v. United States*, 798 F.2d 565 (2d Cir. 1986), undercuts it. In *Barrett*, the plaintiff estate alleged that a New York state hospital, acting at the behest of the Army Chemical Corps, injected the decedent with experimental drugs, killing him. *Id.* at 567. However, after decedent died, plaintiff claimed that New York state lawyers met with federal lawyers, who induced him to hide the Army's involvement through threats. *Id.* at 568–70, 576–77. After discovering the Army Chemical Corps' involvement decades later, the estate filed a federal civil rights action against the federal lawyers, alleging that they violated its right of access to the courts. *Id.* at 570. The Second Circuit held that, because the federal lawyers were "neither parties to the ongoing litigation between the estate and the State of New York nor the subjects of discovery in that action[,] [t]hey therefore were not under any duty to volunteer to the estate information that would alert it to the existence of a claim against the federal government and certain of its officials for [decedent's] wrongful death." *Id.* at 575. Yet, though of no relevance here, the case sanctioned an alleyway to

relief based upon its holding that plaintiff stated a viable right-of-access claim by alleging that they had induced the State's lawyer to "evade disclosure to the estate." *Id.*

Here, unlike the federal lawyers in *Barrett*, Detective Norrito, Detective Tumbarello, ADA Sullivan, ADA Kallen, and ADA Greene are not alleged to have taken any affirmative acts, post-conviction, to thwart plaintiff's ability to seek redress. None of these defendants was a party to plaintiff's § 440 petition, nor were they served with any discovery requests in connection with that litigation. Accordingly, plaintiff's right of access claims predicated on these defendants' purported failure to reveal law enforcement misconduct fails.

Plaintiff's claims predicated on ADA Mintz and DA Gonzalez's alleged post-conviction misconduct fare no better. His allegation that DA Gonzalez rebuffed a vague request for unspecified evidence fails because he "does not identify what precisely the allegedly exculpatory evidence [was], state whether [DA Gonzalez] ever reviewed that alleged evidence, or provide facts indicating that [DA Gonzalez] had no good-faith basis to withhold the evidence." *See Haughey*, 2020 WL 1503513, at *10. The claim that ADA Mintz withheld the Guerrier interview from *Greene* does not plausibly allege that *plaintiff* suffered a constitutional deprivation. While ADA Mintz might have plausibly violated Greene's rights, plaintiff lacks standing to raise those claims on Greene's behalf. *See Empire Merchants, LLC v. Reliable Churchill LLP*, No. 16-CV-5226 (ARR) (LB), 2017 WL 7512900, at *7 (E.D.N.Y. Jan. 30, 2017) ("[A] plaintiff who is injured only as a result of the injury to another . . . generally lacks standing.") (internal quotation marks omitted) (quoting *Bingham v. Zolt*, 66 F.3d 553, 562 (2d Cir. 1995)). But even if plaintiff could claim that ADA Mintz concretely injured him, because she was a prosecutor who allegedly hid the Guerrier interview while litigating a § 440 petition, she is entitled to absolute immunity. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 123 (2d Cir. 2009) ("[A]bsolute immunity shields work

37

performed during a post-conviction collateral attack, at least insofar as the challenged actions are part of the prosecutor's role as an advocate for the state."). Therefore, plaintiff's access-to-courts claims fail and are dismissed with prejudice.

V.    Malicious Prosecution

"To succeed on a malicious prosecution claim under [§] 1983, a plaintiff must show that (1) the defendant commenced or continued a criminal proceeding against him; (2) the proceeding was terminated in the plaintiff's favor; (3) there was no probable cause for the proceeding; and (4) the proceeding was instituted with malice." *Genovese v. Cnty. of Suffolk*, 128 F. Supp. 3d 661, 668 (E.D.N.Y. 2015). To satisfy the favorable termination element, "a plaintiff need only show that the criminal prosecution ended without a conviction." *Thompson v. Clark*, 596 U.S. 36, 39, 142 S. Ct. 1332, 1335, 212 L. Ed. 2d 382 (2022). Here, plaintiff readily admits that he was convicted of first-degree robbery, and that the conviction he now attacks "has never been vacated" and "remains unjustly intact." *See*, *e.g.*, Am. Compl. ¶ 194. As pleaded, the malicious prosecution claim is meritless on its face and is ordered dismissed.

VI.    Equal Protection

Next, plaintiff contends that defendants committed "wrongful actions" against him because of his race. *Id.* ¶ 257. The only factual allegations plaintiff includes in the operative complaint concern Detective Norrito. *Id.* ¶ 257 n.18. Specifically, plaintiff alleges that Detective Norrito used anti-black slurs against Greene and Lenny Best at some point in the 1980s. *Id.* Such allegations are plainly insufficient to state an Equal Protection Claim. "[C]ourts in this Circuit have found that '[t]he use of racial slurs, alone, fail to state a claim for a violation of the equal protection clause of the Fourteenth Amendment.'" *Greene*, 2017 WL 1030707, at *30 (E.D.N.Y. Mar. 15, 2017) (quoting *Oliver v. Cuttler*, 968 F. Supp. 83, 88 (E.D.N.Y. 1997)). Moreover,

38

plaintiff's claim fails because he has not alleged facts that show a government actor intentionally discriminated against him on the basis of his race, as by the discriminatory application of a facially neutral law.  *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). Accordingly, plaintiff's Equal Protection Claim fails and is dismissed with prejudice.

VII.    Claims under §§ 1985(3) & 1986[10]

The operative complaint also asserts claims under 42 U.S.C. §§ 1985(3) and 1986.  To make out a § 1985(3) claim, the plaintiff must plausibly allege that there was "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States."  *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).  Under the second element, the plaintiff must establish that the conspiracy was motivated by "class-based, invidious discriminatory animus," such as race. *Nguyen v. Milliken*, 104 F. Supp. 3d 224, 231 (E.D.N.Y. 2015) (quoting *Robinson v. Allstate Ins. Co.*, 508 F. App'x 7, 9 (2d Cir. 2013)).  Because the operative complaint alleges only that Detective Norrito used racial epithets at unknown times outside of the context of plaintiff's underlying criminal case or post-conviction proceedings, plaintiff's § 1985(3) claim fails for the same reasons as his Equal Protection claim.  "And because a § 1986 claim must be predicated on a valid § 1985

---

[10]  In his opposition papers, plaintiff asserts a § 1983 conspiracy claim for the first time.  *See* Pl.'s Opp. at 55–57.  Because plaintiff may not amend his complaint in his opposition papers, the claim fails.  *See Cadet*, 2008 WL 189873, at *2 n.1; *K.D. ex rel. Duncan*, 921 F. Supp. 2d at 209 n.8. Had he included the conspiracy claim in the operative complaint, it would fail nonetheless, as plaintiff has failed to allege a single, viable § 1983 claim against any defendant.  *See Pierre v. City of New York*, No. 18-CV-5438 (ARR) (RER), 2019 WL 7293390, at *7 (E.D.N.Y. Dec. 30, 2019), *aff'd*, 860 F. App'x 14 (2d Cir. 2021).

claim," that claim falls in tandem.  *See Brown*, 221 F.3d at 341.  Accordingly, both claims are dismissed.

VIII.    *Monell* Liability

Plaintiff interposes a claim under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 98, S. Ct. 2018, 56 L. Ed. 2d 611 (1978) against the City.  Am. Compl. ¶¶ 323–31.  To hold a municipal defendant liable under § 1983, a plaintiff must establish "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995).  "If there is no underlying constitutional violation by a municipal official, the municipality is not liable." *Khan v. Ryan*, 145 F. Supp. 2d 280, 285 (E.D.N.Y. 2001).

Williams' *Monell* claim can be disposed of quickly.  Because he has failed to plausibly allege viable § 1983 claims against any of the individual defendants, "any claims of municipal liability under *Monell* as against the [City] must also be dismissed." *See Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 230 (E.D.N.Y. 2010).

IX.    State Law Claims

The operative complaint states various state law claims against defendants.  A district court may "decline to exercise supplemental jurisdiction over a claim" if it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c).  Whether it is appropriate to do so is committed to "the sound discretion of the district court." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013).  "Generally, where all of the federal claims in an action are dismissed before trial, the balance of factors will favor declining to exercise supplemental jurisdiction over the remaining state law claims." *Eskenazi-McGibney v. Connetquot Cent. Sch. Dist.*, 84 F. Supp. 3d 221, 238 (E.D.N.Y. 2015).  Because that is the case here, plaintiff's

state law claims are dismissed without prejudice to their refiling in a state court of appropriate jurisdiction.

> X.    Leave to Amend

Courts in the Second Circuit typically grant plaintiffs leave to amend their complaint after granting a motion to dismiss. *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 163 (E.D.N.Y. 2018). District courts have the "discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jones v. Cnty. of Suffolk*, 236 F. Supp. 3d 688, 702 (E.D.N.Y. 2017) (quoting *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002)). Amendment is futile where "it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Id.* (quoting *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001)).

Such is the case here. Plaintiff's *Brady*, false arrest, and fabrication of evidence claims are *Heck*-barred, and because plaintiff was aware of the facts that form the basis of his false arrest claim in 1983 and ought to have been aware of his *Brady* and fabrication of evidence causes of action by 2017, it appears that he cannot plead any set of facts that would revive these claims. *See Ying Li v. City of New York*, 246 F. Supp. 3d 578, 646 (E.D.N.Y. 2017) (amendment futile where claims were time barred); *JCG v. Ercole*, No. 11-CV-6844 (CM) (JLC), 2014 WL 1630815, at *24 n.33 (S.D.N.Y. Apr. 24, 2014), *report and recommendation adopted*, 2014 WL 2769120 (S.D.N.Y. June 18, 2014) (finding amendment futile where the plaintiff's claims were time barred and the plaintiff could not "plausibly make an argument for equitable tolling, given his lack of diligence in pursuing his claims"). Likewise, with plaintiff's conviction still outstanding, amendment of his Confrontation Clause and malicious prosecution claims would be futile. *See Opperisano*, 286 F. Supp. 3d at 464; *Falls v. Pitt*, No. 16-CV-8863 (KMK), 2020 WL 2097626, at *5 (S.D.N.Y. May

1, 2020).  And since plaintiff cannot change the fact that neither the Supreme Court nor the Second Circuit has recognized the viability of his access-to-courts claim, amendment of those claims would be futile too.  Finally, with respect to his Equal Protection, Privileges and Immunities, and §§ 1985(3) and § 1986 conspiracies, plaintiff already had one opportunity to amend his complaint and flesh out these claims after defendants filed a pre-motion conference letter stating their intent to move to dismiss the complaint in its entirety.  *See* Defs.' Pre-Motion Conf. Ltr., Dkt. 23, at 1. Nevertheless, he did not.  Thus, these claims are dismissed without leave to amend.

      For ease of reference, the below table provides the status of the claims plaintiff asserts in the operative complaint:

| Claim | Status | Grounds |
| --- | --- | --- |
| *Brady* (post-trial) | Dismissed with prejudice | Qualified immunity |
| *Brady* (trial) | Dismissed with prejudice | *Heck* barred; time barred |
| False Arrest | Dismissed with prejudice | Time barred |
| Confrontation Clause | Dismissed with prejudice | *Heck* barred; time barred |
| Right of Access | Dismissed with prejudice | Qualified and absolute immunity |
| Malicious Prosecution | Dismissed with prejudice | Failure to allege elements of claim |
| Equal Protection | Dismissed with prejudice | Failure to allege elements of claim |
| §§ 1985(3) & 1986 | Dismissed with prejudice | Failure to allege elements of claim |

| *Monell* | Dismissed with prejudice | Failure to allege elements of claim |
| State Law Claims | Dismissed without prejudice | Decline to exercise jurisdiction |

<u>Conclusion</u>

For the foregoing reasons, plaintiffs' complaint is dismissed in its entirety.

Consequently, the Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated:   Brooklyn, New York

September 27, 2025

/s/ Eric N. Vitaliano

ERIC N. VITALIANO

United States District Judge